2012 COA 33

The PEOPLE of the State of Colorado, Plaintiff–Appellee,

v.

Javier DELGADILLO, Defendant–Appellant.

No. 07CA2099.

Colorado Court of Appeals, Div. III.

March 1, 2012.

John W. Suthers, Attorney General, Rebecca Adams Jones, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Douglas K. Wilson, Colorado State Public Defender, Ned R. Jaeckle, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge TERRY.

¶ 1 Defendant, Javier Delgadillo, appeals the judgment of conviction entered upon a jury verdict finding him guilty of first degree sexual assault and two counts of contributing to the delinquency of a minor. Because we conclude that his trial counsel had a conflict of interest that adversely affected counsel's performance, we reverse the judgment, vacate the sentence, and remand for further proceedings.

## I. Background

¶ 2 Defendant took the stand at trial to testify in his own defense. Defendant is a native Spanish speaker, and while he spoke at least some English, he was assisted during trial by an English language interpreter. The following exchange occurred between defendant and his counsel on direct examination:

Q: Mr. Delgadillo, ... did you hear the testimony of ... a technician or scientist from [the] Colorado Bureau of Investigation crime lab in Montrose?

A: Yes, I did hear it.

Q: And will you tell the jury who requested that DNA testing?

A: I did.

Q: Now, did you and I have a conversation before you requested that DNA testing?

A: No, we just had a conversation. You told ... me that it was going to be a tough trial. I asked you what you sug-

gested what to do [sic], and because ... I wanted to prove that it wasn't me; and so you said the most sure thing would be the DNA test. And that's when I went ahead and did it.

. . . .

Q: What did I tell you the result would be of this case if there was a scientific DNA match between you and ... things intimate to [the victim]?

A: [You] told me that they were going to give me 25 to 30 years, no discussion.

Q: If there was a match?

A: Yes, if there was.

[Prosecutor]: Your Honor, I'm going to object to this. It's inappropriate ... to have evidence about possible sentence. Quite frankly, it's not even accurate.

The Court: Sustained. The jury will disregard any potential sentences that may be rendered; and please stay away from that line of questioning, [defense counsel].

[Defense counsel]: Okay.

Q: [by defense counsel]: So realizing or having been advised of the possible benefits and possible bad things that could happen from DNA testing, what did you decide to do?

A: I decided to get my DNA [sic].

Before the close of defendant's case, the prosecutor told the court that defendant had misstated his potential sentencing exposure. The court then held a proceeding in camera for the prosecutor to question defense counsel on that issue. The proceeding was held in chambers. Present were the judge, counsel, defendant, the English language interpreter, and the court reporter.

¶ 3 During the in camera proceeding, defense counsel, while still representing defendant in the ongoing trial, was sworn as a witness to testify about communications he had with defendant concerning the sentencing range. Counsel testified that he told defendant he could be sentenced to twenty-five to thirty years if convicted at trial. The prosecutor then told the court that the sentencing range was four to sixteen years if the sentences were to run concurrently. No one asked defense counsel whether his statement to defendant regarding the sentencing range

referenced a consecutive or concurrent range of sentences. (If the reference was to the higher end of the range based on consecutive sentencing, then the attorney's assessment of the range would not have been erroneous.)

¶ 4 The court then asked defendant to reaffirm that he would still have rejected the plea bargain if he had known that the sentencing range was four to sixteen years. Defendant responded that he would have taken the plea bargain instead of proceeding to trial if he had been told that was the range.

¶ 5 Defendant then inquired whether the previous plea offer was still open, and the prosecutor stated it was not. Further details about the in camera proceeding will be provided below.

¶ 6 The case proceeded to verdict, and defendant was found guilty as noted above.

## II. Conflict of Interest

¶ 7 Defendant contends his Sixth Amendment right to conflict-free counsel was violated when the court swore in his trial counsel and permitted counsel to testify about communications he had with defendant about the ongoing representation. Defendant also asserts that the specter of a potential ineffective assistance of counsel claim and defense counsel's revelation of attorney-client privileged communications further exacerbated the conflict situation. We agree that in the circumstances presented here, there was an actual conflict of interest that deprived defendant of conflict-free representation.

### A. Legal Standards

¶ 8 A defendant has a right to conflict-free counsel. U.S. Const. amend. VI; Colo. Const. art. II, § 16; *People v. Harlan,* 54 P.3d 871, 878 (Colo.2002); *People v. Ragusa,* 220 P.3d 1002, 1006 (Colo.App.2009).

¶ 9 A conflict of interest exists when the attorney's ability to represent a client is materially limited by the attorney's own interests. Colo. RPC 1.7(b); *People v. Edebohls,* 944 P.2d 552, 556 (Colo.App.1996). "[A]n attorney [must] cease representing a client [when] the attorney's ability to champion the cause of the client becomes substan-

tially impaired." *Rodriguez v. Dist. Court,* 719 P.2d 699, 704 (Colo.1986).

¶ 10 Conflicts are categorized as either actual or potential. *Ragusa,* 220 P.3d at 1006. An actual conflict of interest is one that is real and substantial, whereas a potential conflict is one that is possible or nascent, but in all probability will arise. *Id.*

### B. Trial Court's Statement to Defendant Regarding the In Camera Proceeding

¶ 11 The in camera proceeding occurred before the defense rested its case. At the start of the in camera proceeding, the court stated the following:

> Mr. Delgadillo, the [prosecutor] is concerned about some testimony that you gave regarding what you were advised by [defense counsel] concerning possible penalties if you are found guilty at trial. She's concerned that you might not have been advised properly as to what the sentence really is—could be potentially, and so I'm going to swear [defense counsel] in and ... let [the prosecutor] question [defense counsel] on a very, very limited basis just to that issue.
>
> And this will be under seal, and this does not constitute a waiver in any way, shape, or form of any attorney-client privilege that may exist between [defense attorney] and his client.

¶ 12 No one asked defendant whether he would waive the attorney-client privilege to allow his counsel to testify, or explained what the consequences might be if defense counsel testified inconsistently with defendant's trial testimony.

¶ 13 The prosecutor questioned defense counsel, and a lengthy discussion ensued among the court, counsel, and defendant, as addressed below.

### C. Discussion

¶ 14 Although, as it turned out, defense counsel's testimony was consistent with defendant's on the sentencing range issue, the possibility was nevertheless present that defense counsel's testimony might be contrary to his client's interests. If defense counsel's testimony had contradicted defendant's own testimony, it was possible that the prosecution could have sought to use any inconsistency to impeach defendant's testimony. In fact, the prosecutor stated the following during the in camera session: "Quite frankly, I assumed that the defendant had misunderstood his attorney; and when we started this, I thought it would be *evidence of him giving an inconsistent statement.* I didn't think that his attorney misadvised him. I didn't think that was what the answer was going to be." (Emphasis added.)

¶ 15 This possibility was not mitigated by the court's statement to defendant that there was no waiver of the attorney-client privilege. The attorney-client privilege is codified in section 13–90–107(1)(b), C.R.S.2011, and operates to protect communications between attorney and client relating to legal advice. *Wesp v. Everson,* 33 P.3d 191, 196 (Colo.2001). It protects communications "by or to the client in the course of gaining counsel, advice, or direction with respect to the client's rights or obligations" which the client reasonably believes will be kept confidential. *Gordon v. Boyles,* 9 P.3d 1106, 1123 (Colo.2000); accord *Ragusa,* 220 P.3d at 1006–07; *see also* Colo. RPC 1.6(a). The client holds the privilege, and only the client may waive it. *People v. Madera,* 112 P.3d 688, 690 (Colo.2005).

¶ 16 Even if defendant's trial testimony about his discussions with counsel could be viewed as having waived the attorney-client privilege, the record does not reflect any explanation to defendant that he had made such a waiver or what the consequences of such a waiver would be. Moreover, the trial court's statement to defendant just before his counsel was sworn in—that "this does not constitute a waiver ... of any attorney-client privilege"—confused the issue.

¶ 17 In essence, the court and counsel improperly violated the attorney-client privilege without any input from defendant as to whether he understood or agreed that attorney-client privileged information or trial strategy could be revealed, and the potential consequences of such a waiver.

¶ 18 The court and the prosecutor then questioned whether defense counsel had improperly advised defendant of the sentencing range and whether this affected defendant's decision whether to take a plea bargain. In so doing, the court and the prosecutor impliedly questioned the quality of defense counsel's representation, thus raising the specter of an ineffective assistance of counsel claim.

¶ 19 The record indicates that defense counsel was aware that an ineffective assistance of counsel claim might be made. He stated:

Well, Judge, our view is, is that it is possible for—to have ineffective assistance of counsel in pretrial advice given to a defendant, and that can—in principle, can consist of misadvising a defendant of that— the punishment—incorrectly advis[ing] him that the punishment is significantly higher than he thinks it is when he makes a decision or that it's significantly lower.

But regardless of that, this is what we have [Crim. P.] 35(c) motions for ... and I believe that we should continue through this trial; and as [in] any other contested case, if Mr. Delgadillo wants to raise that issue after trial by way of a [Crim. P.] 35(c) motion, then he can do that.

¶ 20 The in camera proceeding became an inquiry into whether defense counsel had rendered ineffective assistance. In such an inquiry, counsel's conduct and reputation were subtly but necessarily impugned. *Cf. Murphy v. People,* 863 P.2d 301, 304 (Colo. 1993) (impermissible conflict of interest found where the defendant filed a pro se Crim. P. 35(c) motion alleging ineffective assistance of trial counsel and district court appointed that same counsel to litigate the ineffectiveness claim); *McCall v. District Court,* 783 P.2d 1223, 1227 (Colo.1989) ("A local public defender faced with the prospect of arguing his or her own incompetence to protect a client's interests on appeal clearly has a conflict of interest requiring disqualification."), *abrogated by* Colo. RPC 1.11 cmt. 2 as stated in *People v. Shari,* 204 P.3d 453, 459 (Colo.2009).

¶ 21 This inquiry placed counsel in a position such that, regardless of whether he rendered ineffective assistance, he apparently felt compelled to divulge attorney-client privileged information and defense strategy in order to justify the advice he gave to defendant. During the course of the court's inquiry, defense counsel made the following disclosures:

● I should add that this was in the context of [defendant] deciding whether to do the DNA test, because, you know, I told him if there was a match to—between his DNA and something intimately connected to [the victim] or her bedroom, he would certainly be convicted, and was facing a very long sentence in prison.

● There were two conversations: One had to do about whether to get the DNA testing, and you know, I told him that if there was a match, that he took more than the two steps into [the victim's] house, then I mean, he would be convicted, and he could expect to go to prison for a long time. He asked, How much? And I said, I don't know; 25 to 30 years.

● [I]t's certainly true that when the question came up of what is the downside of the DNA testing, you know, I wanted to impress on him that it would be devastating if there was a match. So he had to be darn sure of his innocence; and he said, No, go for it.

● [In discussions about the plea offer, we] talked about, you know, the likelihood he could stay out of trouble for four years; and then we talked about the other two cases that he's got pending: one is for violation of bail bond; and I think the other one has to do with, you know, use of cocaine.

● ... I talked to his mom ... and they were looking for some thread of hope that it may be possible for him, depending on the outcome of these cases, to get a green card.

● [O]ne of the things that was, I think, a very important factor for him [in considering the plea offer] is a deferred judgment would be considered a conviction of an aggravated felony by the immigration authorities.... And if he can get through all these legal proceedings without picking up, you know, an aggravated

felony, or I guess more precisely, a crime involving moral turpitude, then theoretically, it's possible for him to get a green card. So that was a factor too.

- And [defendant's family] brought me an I–130, which was filed a long time ago; and so, you know, I'm, in part, relying on his family to figure out what he really wants. And there was, you know, a theoretical possibility that he could get a green card; and so it was important. . . .

- I believe it was when I explained to him that the deferred judgment—it would be regarded as a conviction for immigration purposes; and that seemed to be important in making up his mind for, as he said, do all or nothing.

¶ 22 While the first three of these responses were an expansion on, and consistent with, defendant's trial testimony, counsel should not have been placed in a position of giving that testimony during trial without, at a minimum, appropriate advice to, and express waiver by, defendant. These revelations under oath were improper disclosures of attorney-client privileged information.

¶ 23 At no point during the in camera proceeding was there a clear demarcation of when defense counsel had ceased testifying, and when, if at all, he was supposed to have transitioned back into the role of advocate. The record reflects defense counsel's inherent conflict in trying to simultaneously respond to questioning from the court and the prosecutor, justify his earlier advice to defendant, and remain a zealous advocate. See *Maples v. Thomas,* —— U.S. ——, —— n. 8, 132 S.Ct. 912, 181 L.Ed.2d 807 (2012) (noting law firm's conflict of interest in continuing to represent the defendant in postconviction proceedings where, to protect the firm's interest in its own reputation, the firm failed to assert the strongest argument in his favor, namely, its abandonment of him). While laboring under these divergent pressures, defense counsel's ability to represent his client was materially limited.

¶ 24 The court and the prosecutor appeared genuinely concerned that defendant might have been misadvised as to the sentencing range. However, if they were trying to offer immediate assistance to defendant, or to forestall the possibility of a postconviction Crim. P. 35(c) motion, it is unclear how highlighting supposed ineffective assistance of defense counsel in the midst of trial could have accomplished these goals. Given that the prosecution refused to renew the plea offer or recommence plea negotiations, there was no available remedy for the situation. *Cf. Carmichael v. People,* 206 P.3d 800, 809–10 (Colo.2009) (where the defendant rejected a plea bargain because his counsel misadvised him as to possible sentencing exposure, and the defendant filed a postconviction motion for new trial alleging ineffective assistance of trial counsel based on that conduct, remedy was to reverse judgment of conviction and sentence, remand for a new trial, and allow renewed plea negotiations).

¶ 25 "The need for defense counsel to be completely free from a conflict of interest is of great importance and has a direct bearing on the quality of our criminal justice system." *Allen v. Dist. Court,* 184 Colo. 202, 205, 519 P.2d 351, 352–53 (1974). We conclude that, when viewed in combination, the swearing-in of defense counsel to testify about communications he had with defendant pertaining to the ongoing representation; the possibility that the prosecution could have obtained from counsel material to impeach defendant; defense counsel's disclosures of attorney-client privileged information and defense strategy; and the specter of an ineffective assistance claim, created an actual conflict of interest. *See Ragusa,* 220 P.3d at 1006 (holding that cumulative effect of defense attorneys' willingness to reveal privileged communications to the court and prosecutors, while failing to disclose the conflict to their client, violated the defendant's constitutional right to make an intelligent and informed choice whether to continue with counsel after a conflict arose).

### III. Conflict Adversely Affected Representation

¶ 26 A conflict of interest does not, by itself, create a constitutional violation. *Cuyler v. Sullivan,* 446 U.S. 335, 350, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). Rather, a defendant must establish that "an actual conflict of interest adversely affected his law-

yer's performance." *Id.* If a defendant successfully shows that the conflict affected the adequacy of representation, he need not demonstrate prejudice as a prerequisite for relief. *Id.* at 349–50, 100 S.Ct. 1708; *see also Mickens v. Taylor,* 535 U.S. 162, 171, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002).

¶ 27 After the conflict arose here, defense counsel engaged in conduct that demonstrates that the conflict adversely affected the adequacy of defendant's representation. Specifically, he failed to advise his client about the conflict as required by *People v. Edebohls,* 944 P.2d 552 (Colo.App.1996), and divulged privileged attorney-client communications and defense strategy to both the court and the prosecutor.

### A. Failure to Disclose Conflict

¶ 28 Defense counsel and the trial court both have specific obligations to a defendant when a conflict of interest arises. *Edebohls,* 944 P.2d at 556.

#### 1. Attorney's Failure to Disclose Conflict

¶ 29 In *Edebohls,* the court set forth the procedure counsel must follow when a conflict of interest arises between a defendant and defense counsel:

> [D]efense counsel has a duty to advise the defendant of the nature of the conflict and, in plain terms, to describe the specific ways in which the conflict may affect his or her ability to represent the defendant effectively at various stages of the case. Defense counsel should then place on the record the potential conflict of interest and should further advise the court that as complete a disclosure as possible has been made to the defendant.

*Id.*

¶ 30 The events here created a conflict that required defense counsel to make a complete disclosure of the conflict to defendant. *Id.* The record shows no indication that counsel either advised defendant of the conflict or informed the court he had made such an advisement.

#### 2. Trial Court's Failure to Disclose Conflict

¶ 31 A trial court also has a duty to inquire into the propriety of continued representation if it knows or should reasonably know that a conflict exists. *Id.* A defendant should have the opportunity to discuss the conflict with either defense counsel or independent conflict advisement counsel. *Id.* After the defendant has been fully informed about the conflict, "the trial court should then seek from the defendant a narrative response, on the record, indicating his or her understanding of the right to conflict-free representation and a description of the conflict at issue." *Id.* The court has an obligation to act proactively to "clarify any confusion the defendant may have about the advisement." *Id.*

¶ 32 Here, the court should have recognized the existence of a conflict of interest, and should have explained to defendant on the record the nature of the conflict and that he was entitled to conflict-free counsel. Again, the record is devoid of any such advisement.

¶ 33 As a result of the conflict situation in which defense counsel found himself, namely, testifying about his own privileged communications with his client while his effectiveness was being questioned, counsel appears to have lost sight of his duty to advise his client as required by *Edebohls.* This demonstrates that the conflict adversely affected the adequacy of defendant's representation. This adverse effect was heightened by the trial court's failure to advise defendant in accordance with its own duties as described in *Edebohls.*

### B. Disclosure of Privileged Communications and Defense Strategy

¶ 34 Defense counsel exacerbated the conflict situation when he divulged attorney-client privileged communications during the in camera proceeding. He volunteered information about case strategy, including whether to seek DNA testing; defendant's other pending charges; and defendant's immigration issues. As noted above, any supposed waiver of the attorney-client privilege

by defendant's trial testimony was muddled by the trial court's assurance that there was no waiver. There having been no valid waiver of the privilege here, defense counsel was not at liberty to make these disclosures.

¶ 35 A review of the transcript of the in camera proceeding leaves the impression that defense counsel lost sight of his responsibilities to defendant in his attempts to justify his own actions. His conduct in the in camera proceeding shows that the conflict adversely affected the quality of representation.

## IV. Remedy

¶ 36 After a defendant has established that an actual conflict exists, the court should not " 'indulge in nice calculations as to the amount of prejudice' attributable to the conflict." *Cuyler*, 446 U.S. at 349, 100 S.Ct. 1708 (quoting *Glasser v. United States*, 315 U.S. 60, 76, 62 S.Ct. 457, 86 L.Ed. 680 (1942)). Rather, a showing that an actual conflict of interest affected the quality of representation conclusively establishes a constitutional violation requiring reversal. *Id.*; *Mickens*, 535 U.S. at 171, 122 S.Ct. 1237; *Ragusa*, 220 P.3d at 1008; *People v. Miera*, 183 P.3d 672, 677 (Colo.App.2008).

¶ 37 We conclude that defendant adequately demonstrated that defense counsel's actual conflict of interest adversely affected the quality of defendant's representation, and that reversal and a new trial are thus required.

## V. Deprivation of Counsel

¶ 38 Our decision to reverse the judgment is further bolstered by defendant's deprivation of counsel during the in camera proceeding. A criminal defendant has a right to counsel at every critical stage of the proceedings against him. U.S. Const. amend. VI; Colo. Const. art. II, § 16; *People v. Roybal*, 618 P.2d 1121, 1126 (Colo.1980).

¶ 39 For two reasons, we conclude this was a critical stage. First, during the in camera proceeding, in response to the court's questioning, defendant attempted to rekindle plea negotiations, although he was rebuffed by the prosecutor. *See Carmichael*, 206 P.3d

at 805 ("the entire plea bargaining process" is a critical stage, creating entitlement to counsel). And second, the prosecution was cross-examining defense counsel with the avowed expectation that counsel's testimony would contradict defendant's trial testimony, raising the possibility that counsel's testimony could have been used to impeach defendant.

¶ 40 During the in camera proceeding, defendant lacked representation dedicated solely to advocating his interests. We cannot conclude that this error was harmless beyond a reasonable doubt, as defendant remained uninformed about the conflict of interest and was without assistance to determine how to proceed after the conflict arose between him and his counsel. *Cf. Key v. People*, 865 P.2d 822, 827 (Colo.1994) (concluding that constitutional harmless error analysis applied when defendant was not totally deprived of counsel).

## VI. Other Issues

¶ 41 We need not address defendant's other assertions of error because they are unlikely to arise again on remand.

¶ 42 Thus the judgment is reversed, the sentence is vacated, and the case is remanded for a new trial.

Judge ROY and Judge GABRIEL concur.