2014 COA 84

**The PEOPLE of the State of Colorado,**
Plaintiff–Appellee,

v.

**Todd William NEWMILLER,**
Defendant–Appellant.

**Court of Appeals No. 10CA2139**

Colorado Court of Appeals,
Div. II.

Announced July 3, 2014

John W. Suthers, Attorney General, Patricia R. Van Horn, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee

Douglas K. Wilson, Colorado State Public Defender, Andrew C. Heher, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant

Opinion by JUDGE BERGER

¶ 1 Defendant, Todd William Newmiller, appeals the district court's order denying his Crim. P. 35(c) motion for postconviction relief. We affirm.

## I. Background

### A. Facts

¶ 2 Defendant, his brother, and their friends, Brad Orgill, Jason Melick, and Michael Lee, went to a strip club in Colorado Springs to celebrate defendant's birthday. When the group was leaving the club, they had an altercation with another group, consisting of the victim, Chisum Lopez, and Charles Schwartz, regarding a comment someone in the victim's group had made to a dancer.

¶ 3 Both groups eventually left the club in separate vehicles. About a half block away, the victim's group stopped its pickup truck in the middle of the street. Defendant's group stopped its Jeep behind the truck. The two groups confronted each other, and at some point during that confrontation, the victim was stabbed in the heart.

¶ 4 All the participants, including the victim, fled from the scene. The victim's group headed to the hospital but pulled over when the 911 dispatcher told them to wait for an ambulance. The victim was transported to the hospital by ambulance and pronounced dead on arrival.

¶ 5 The following day, Melick learned that someone had been killed in the same area where the fight had occurred. He placed an anonymous phone call to the police and named defendant as the killer. Defendant was arrested and a search of his person uncovered a knife. Forensic testing revealed a small amount of blood matching the victim's on the blade of the knife.

### B. Trial

¶ 6 Defendant was charged with second degree murder. He did not testify at trial, but everyone else involved did. Although there were substantial inconsistencies in the testimony, the record establishes that no one saw defendant stab the victim, no one saw defendant confront the victim, and no one saw any of the parties with a weapon that night before or during the fight. The record also establishes that during the altercation, Orgill exchanged punches with the victim and defendant verbally argued with Lopez. It was uncontested that defendant stabbed one of the truck's tires right before the victim's group drove away.

¶ 7 The prosecution's theory of the case was that defendant stabbed the victim at the very beginning of the confrontation and the victim remained alive for several minutes after he had been stabbed. The prosecution

had to establish that defendant stabbed the victim then because other than during the first few seconds after defendant and the victim left their respective vehicles, someone from the victim's or defendant's group saw either the victim or defendant at all times, and no one saw them near each other. The prosecution thus had to show that the victim lived for some time after he was stabbed, during which time he fought with Orgill.

¶ 8 In support of its theory, the prosecution offered testimony from Joel Newmiller (defendant's brother), Melick, Orgill, and Lee.[1] Joel testified that when defendant's group got back in the Jeep after the fight, he became upset after seeing a cut on his brother's (defendant's) face. Joel testified that defendant attempted to calm him down by saying, "[d]on't worry about it. I slashed their tire and I stabbed one of them." Melick also testified that Joel started "freaking out" because defendant had been hit; in response, defendant said to Joel, "[d]on't worry. Don't worry, I stabbed him." Melick testified that defendant then said to the other occupants of the vehicle, "I stabbed the guy, okay?" and "[y]ou guys don't know nothing about this, okay?"

¶ 9 Orgill and Lee testified that they did not hear defendant say anything at that time about stabbing anyone; however, they both testified that when the three of them were at Orgill's house later that night, defendant said something like he hoped he had not stabbed anyone or he thought he might have stabbed someone. Orgill, Lee, and defendant looked at defendant's knife, but no blood was visible.

¶ 10 Orgill's clothes were covered heavily in blood. Defendant also had some blood on his clothing. As a result, both Orgill and defendant burned their clothes.

¶ 11 Defendant was convicted of second degree murder with a deadly weapon and sentenced to thirty-one years imprisonment.

## C. Direct Appeal

¶ 12 A division of this court affirmed defendant's conviction and sentence on direct appeal. *People v. Newmiller*, (Colo.App. No. 06CA1402, 2008 WL 2133008, May 22, 2008)

(not published pursuant to C.A.R. 35(f)). The supreme court denied defendant's petition for writ of certiorari.

## D.Crim. P. 35(c) Motion

¶ 13 Defendant moved for postconviction relief pursuant to Crim. P. 35(c), claiming that his trial attorneys rendered ineffective assistance of counsel. After holding a hearing, the postconviction court issued a lengthy and comprehensive written order denying the motion.

¶ 14 Defendant appeals. Specifically, he argues that his trial attorneys, Attorney 1 and Attorney 2, were ineffective because (1) they failed to request instructions on lesser included offenses and did not consult with and advise defendant regarding lesser included offenses; (2) they failed to request an instruction on the lesser nonincluded offense of accessory to crime; (3) they failed to offer testimony from a medical expert and failed to consult with and retain an expert in crime scene analysis; and (4) Attorney 1 labored under an actual conflict of interest that affected his advice regarding defendant's right to testify and both attorneys failed to adequately consult with and advise defendant regarding testifying.

## II. Law

¶ 15 A criminal defendant is constitutionally entitled to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To obtain relief based on ineffective assistance of counsel, a defendant must show that (1) counsel's performance was deficient and (2) counsel's deficient performance prejudiced the defense. *Ardolino v. People*, 69 P.3d 73, 76 (Colo.2003) (citing *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052). The defendant bears the burden of proving both prongs of the *Strickland* test. *Dunlap v. People*, 173 P.3d 1054, 1061 (Colo.2007).

¶ 16 Counsel's performance is deficient if the defendant shows that counsel's representation "fell below an objective standard of reasonableness." *Ardolino*, 69 P.3d at 76 (citing *Strickland*, 466 U.S. at 687–88, 104

---

**1.** All of these persons except Melick testified in accordance with plea agreements.

S.Ct. 2052). Judicial scrutiny of counsel's performance is highly deferential. *Id.* (citing *Strickland,* 466 U.S. at 698, 104 S.Ct. 2052). The court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Davis v. People,* 871 P.2d 769, 772 (Colo. 1994) (citing *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052). Because hindsight is almost always accurate, it is easy for a court evaluating an ineffective assistance claim to point to some action counsel should have taken. A reviewing court therefore must make "every effort ... to eliminate the distorting effects of hindsight ... and to evaluate [counsel's challenged] conduct from counsel's perspective at the time." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052.

¶ 17 To establish prejudice, the defendant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Ardolino,* 69 P.3d at 76 (citing *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052). A reasonable probability does not mean that counsel's deficient performance more likely than not altered the outcome in the case. *Id.* (citing *Strickland,* 466 U.S. at 693–94, 104 S.Ct. 2052). Rather, a reasonable probability means a probability sufficient to undermine confidence in the outcome. *Id.* (citing *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052).

¶ 18 A claim of ineffective assistance of counsel presents a mixed question of law and fact. *Dunlap,* 173 P.3d at 1063. In reviewing a postconviction court's findings on a mixed question of law and fact, we defer to the court's findings of fact as long as they are supported by the record but review its conclusions of law de novo. *Id.* The ultimate determination of whether an attorney rendered ineffective assistance of counsel is a question of law we review de novo. *See People v. Brown,* 250 P.3d 679, 681 (Colo. App.2010).

### III. Defendant's Ineffective Assistance Allegations

### A. Failure to Request Lesser Included Offense Instructions

¶ 19 Defendant argues that trial counsel's failure to request lesser included offense in-structions and consult with and advise him on lesser included offenses constituted ineffective assistance of counsel. He asserts that strong evidence supported such instructions; that the evidence showed at least a reasonable probability of conviction on a lesser offense; and that there was no downside to having the jury so instructed.

¶ 20 Defendant testified at the Crim. P. 35(c) hearing that neither of his attorneys discussed with him the possibility of requesting instructions on lesser included offenses, including reckless manslaughter and negligent homicide. Attorney 1 testified that he did not recall discussing lesser included offenses with defendant, but that jury instructions were Attorney 2's responsibility. Attorney 2 testified that she did not remember specifics regarding jury instructions or lesser included offenses, but that she assumed she had considered and discussed with Attorney 1 whether any lesser included offenses would have been helpful to the defense. She testified that she was sure that if she had thought it was appropriate, she would have asked for a lesser included offense instruction.

¶ 21 However, she testified that the defense was, from the beginning, an "all-or-nothing" case:

> [M]y feeling coming into the case is I was thinking that the best course of action would be a self-defense case.... [But] when I met [defendant], it was I did not do this; it wasn't a self-defense case.... [So] I was in a bit of a disagreement with the road we were going down, but [defendant] was absolutely adamant that he did not do this, and the course was going to be the way it was.

She therefore explained that if a lesser included offense instruction had been given, "[i]t would have been one of those kind of awkward situations where a defense attorney is arguing he did not do this, but if you think he did, then find him guilty of something less than second-degree murder, which is not always a great way to go."

¶ 22 The postconviction court found that both of defendant's trial attorneys were "highly experienced criminal defense attorneys," a finding which is supported by the

record. At the time of defendant's trial, Attorney 1 and Attorney 2 had about thirteen years and nineteen years of criminal defense experience, respectively. The court further found that both had tried a "very large number of felony cases," with Attorney 1 having tried five homicide cases and Attorney 2 having tried nineteen.

¶ 23 The court concluded that counsel's failure to request a lesser included offense instruction or consult with defendant on the matter did not constitute ineffective assistance. It explained:

> At all times, [defendant] was insistent upon his innocence and considered the case to be an all-or-nothing case. Thus it was understandable that [Attorney 2] did not consult with [defendant] and highly probable that consultation would not have resulted in a request for a lesser offense instruction. [Attorney 2] was a highly experienced criminal defense lawyer, she and [Attorney 1] had thoroughly prepared the case, and after the presentation of the People's case, [Attorney 2] was confident that there was at least a reasonable likelihood of acquittal. Instructing the jury on a lesser included offense would have risked conviction of the lesser offense instead of an outright acquittal.

We agree with the court that defendant has not established that his trial attorneys were constitutionally ineffective in this area.

¶ 24 Colorado law provides that "[t]he decision whether to request jury instructions on lesser offenses is a tactical decision that rests with defense counsel after consultation with the defendant." *Arko v. People,* 183 P.3d 555, 556 (Colo.2008). We disagree with defendant that because *Arko* requires consultation, failure to consult is per se unreasonable under the first prong of *Strickland.* Rather, the relevant inquiry is whether "counsel's assistance was reasonable *considering all of the circumstances*" or whether, "*in light of all the circumstances,* the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Strickland,* 466 U.S. at 688, 690, 104 S.Ct. 2052 (emphasis added).

¶ 25 Therefore, to determine whether counsel's decision not to request lesser included offense instructions was objectively reasonable, we must examine counsel's entire performance as it relates to this matter, especially because counsel retains the ultimate decisionmaking authority on this issue. *See Van Alstine v. State,* 263 Ga. 1, 426 S.E.2d 360, 363 (1993) (concluding that, although it is critically important for defense lawyers to consult with defendants in such matters as whether to request lesser included offenses, the failure to follow this practice in every case does not constitute ineffective assistance of counsel as a matter of law, and the inquiry rather must focus on the consequence when that practice has not been followed).

¶ 26 The Tenth Circuit has explained that "the general presumption of objective reasonableness requires [a defendant] to 'overcome the presumption that under all the circumstances, the challenged action *might* be considered sound trial strategy.'" *Bullock v. Carver,* 297 F.3d 1036, 1046 (10th Cir.2002) (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052). Counsel's decision in this case not to request lesser included offense instructions clearly could have been a sound trial strategy; both Attorney 1 and Attorney 2 testified at the postconviction hearing that they had believed there was a good chance for an acquittal. A lesser included offense instruction risked a compromise verdict in which the jury convicted defendant of a lesser included offense rather than acquitting him outright. Given defendant's participation in a deadly encounter, even if the jury did not believe he committed murder, the presence of lesser included offenses would have created a substantial risk that the jury would convict defendant of some offense.

¶ 27 "[W]here it is shown that a particular decision was, in fact, an adequately informed strategic choice, the presumption that the attorney's decision was objectively reasonable becomes 'virtually unchallengeable.'" *Id.* at 1046 (quoting *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052) (emphasis omitted). The record shows that counsel had thoroughly investigated the facts of the case. Moreover, given the state of the evidence at the close of the prosecution's case, it was not unreason-

able for counsel to believe acquittal was a real possibility and consequently to not consider lesser included offense instructions.

¶ 28 Except in situations where counsel was plainly incompetent, most courts that have considered this issue have concluded that the decision not to request lesser included offense instructions was a reasonable trial strategy. *See, e.g., State v. Grier,* 171 Wash.2d 17, 246 P.3d 1260, 1273 (2011) (concluding that the failure to request lesser included offense instructions did not constitute deficient performance because based on the evidence and defense theories, "acquittal was a real possibility albeit a remote one" and "defense counsel reasonably could have believed that an all or nothing strategy was the best approach to achieve an outright acquittal"); *see also Butcher v. Marquez,* 758 F.2d 373, 376–77 (9th Cir.1985); *Heinlin v. Smith,* 542 P.2d 1081, 1082 (Utah 1975); *cf. Richards v. Quarterman,* 566 F.3d 553, 569 (5th Cir.2009) (concluding that defense counsel's failure to request a lesser included offense instruction on assault was deficient and not a strategic decision because counsel misunderstood the law governing lesser included offenses and failed to recognize it was entirely possible that the jury would not believe the defendant's claim of self-defense but would also believe he did not kill the victim).[2]

¶ 29 We agree with these courts and conclude that counsel made an adequately informed strategic decision to not request lesser included offense instructions, and defendant has not rebutted the "virtually unchallengeable" presumption that the decision was objectively reasonable. *Bullock,* 297 F.3d at 1046 (internal quotation marks omitted).

¶ 30 Accordingly, counsel's failure to request lesser included offense instructions and to consult with defendant on the matter did not constitute deficient performance under prong one of *Strickland.* Because defendant

has not established that counsel's failure in this respect met the first prong of *Strickland,* we do not address the second prong, prejudice. *See Strickland,* 466 U.S. at 697, 104 S.Ct. 2052 ("[A] court [need not] address both components of the inquiry if the defendant makes an insufficient showing on one.").

### B. Failure to Request an Accessory Instruction

¶ 31 Defendant argues that his trial counsel were ineffective because they failed to request an instruction on the lesser nonincluded offense of accessory to crime. The postconviction court concluded that the failure to request this instruction did not constitute ineffective assistance because there did "not appear to have been any factual basis for an instruction on the lesser offense of [a]ccessory" given that "the evidence was that the defendant burned his own clothes, not Orgill's." The court also explained:

> [A] finding of guilty of accessory would have required a jury finding beyond a reasonable doubt that another person, presumably Orgill, had committed the homicide. Such a finding, which the jury could have made with or without an accessory instruction, would have assured the defendant's acquittal of the charge of murder. The jury in fact rejected the finding (that Orgill committed the crime) necessary to have convicted the defendant of accessory.

We agree with the court that counsel's failure to request an instruction on accessory did not constitute ineffective assistance.

¶ 32 "A lesser non[ ]included offense is an offense less serious than the charged offense, arising from the same facts but containing at least one element different from those in the original charge." *People v. Garcia,* 17 P.3d 820, 826 (Colo.App.2000). A defendant has the right to have the jury instructed on a lesser nonincluded offense as part of the defendant's theory of the case "if

---

2. The only Colorado case that addresses whether defense counsel's failure to request a lesser offense instruction constituted ineffective assistance of counsel is *People v. Aguilar,* 2012 COA 181, ¶¶ 13–16, 317 P.3d 1255. In *Aguilar,* the division concluded that because the trial court could have properly denied a tendered lesser offense instruction, the defendant could not

prove that counsel's performance was deficient in this regard. *Id.* at ¶ 16. The situation in *Aguilar* thus was different from the situation here because in this case, it likely would have been error for the trial court to have denied a tendered lesser included offense instruction on negligent homicide or reckless manslaughter.

there is a rational basis in the evidence to support a verdict acquitting [the defendant] of [the] greater offense ... and convicting [the defendant] of the lesser offense." *People v. Trujillo,* 83 P.3d 642, 645 (Colo.2004) (internal quotation marks omitted).

¶ 33 "A person is an accessory to crime if, with intent to hinder, delay, or prevent the discovery, detection, apprehension, prosecution, conviction, or punishment of another for the commission of a crime, he renders assistance to such person"; "[r]ender assistance" means, among other things, "[c]onceal, destroy, or alter any physical or testimonial evidence that might aid in the discovery, detection, apprehension, prosecution, conviction, or punishment of such person." §§ 18–8–105(1), (2)(e), C.R.S.2013. To be convicted under the accessory statute, a defendant must know that the principal committed the crime, which requires a showing that the defendant had "knowledge of the general character of the underlying offense." *Barreras v. People,* 636 P.2d 686, 688 (Colo. 1981).

¶ 34 We conclude defendant has not shown that counsel's performance was deficient in failing to request an accessory instruction because defendant has not overcome " 'the presumption that under all the circumstances, the challenged action *might* be considered sound trial strategy.' " *Bullock,* 297 F.3d at 1046 (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052) (some internal quotation marks omitted). Counsel's failure to request an instruction on the lesser nonincluded offense of accessory clearly could have been a sound trial strategy for the same reasons that the failure to request instructions on lesser included offenses could have been: submission to the jury of a lesser offense risked conviction on that offense rather than outright acquittal if the jury did not believe defendant was guilty of second degree murder. Also, instructing the jury on a lesser nonincluded offense carries an additional risk, not present in the lesser included offense context: that a defendant will be convicted of both the charged offense and the lesser nonincluded offense. *People v. Skinner,* 825 P.2d 1045, 1047–48 (Colo.App.1991).

¶ 35 Defendant did not introduce any evidence that the failure to request an instruction on accessory could *not* have been considered a sound trial strategy from the perspective of counsel at the time, nor has he shown that a misunderstanding of law or lack of investigation into the facts of the case contributed to counsel's failure in this respect. We therefore conclude that defendant has not rebutted the presumption that counsel's failure to request an instruction on accessory was objectively reasonable.

¶ 36 Accordingly, defendant has not demonstrated that counsel's failure to request a lesser nonincluded instruction on accessory to crime constituted deficient performance. Because defendant has not established that counsel's failure in this respect met the first prong of *Strickland,* we do not address the prejudice prong. *See Strickland,* 466 U.S. at 697, 104 S.Ct. 2052.

### C. Failure to Call Expert Witnesses

¶ 37 Defendant argues that his trial attorneys were ineffective because they failed to present testimony from an expert witness in medicine and failed to consult with and hire a crime scene analysis expert. We disagree.

#### 1. Medical Expert

¶ 38 At trial, the prosecution called Dr. George Hertner, an emergency room physician who saw the victim when he arrived at the hospital. Dr. Hertner, qualified as an expert in emergency medicine, testified that death is not always instantaneous with the type of wound that the victim suffered.

¶ 39 The prosecution also presented testimony from Dr. Donald Ritchey, who had performed the autopsy on the victim, as an expert in forensic pathology. Dr. Ritchey testified that it was extremely likely that after the victim was stabbed, blood pooled in his pericardium (the sac enclosing the heart) and slowed the flow of blood from the wound, an occurrence known as pericardial or cardiac tamponade. In his opinion, the cardiac tamponade prevented the victim from immediately bleeding out, and thus the victim could have lived for some period of time after he was stabbed, supporting the prosecution's theory that defendant could have stabbed the

victim before the victim fought with Orgill. Dr. Ritchey testified that cardiac tamponade could make the difference between someone dying within a minute versus within fifteen to twenty minutes.

¶ 40 At the Crim. P. 35(c) hearing, defendant offered testimony from Dr. David Glaser as an expert in emergency medicine. Dr. Glaser testified that "in general," it is possible for a treating emergency room physician to estimate how long a deceased patient would have lived following a stab wound to the heart. He also testified that the type of wound the victim suffered would be unlikely to cause cardiac tamponade and that he would be surprised if the victim had survived more than a minute or two after the wound was inflicted, with two minutes being the upper limit. On cross-examination, Dr. Glaser admitted that he agreed with Dr. Ritchey and Dr. Hertner that it is not possible to know for sure how long someone with the type of wound the victim suffered would have survived and that it would depend on various factors. He also answered affirmatively when asked whether the victim could have engaged in a fight for a short period of time after having been stabbed.

¶ 41 The prosecution called Dr. Robert Bux at the Crim. P. 35(c) hearing as a rebuttal witness to Dr. Glaser. Dr. Bux testified that it is not possible to determine specifically how long somebody will live after receiving a stab wound to the heart. He testified that the victim had some degree of cardiac tamponade while he was still alive and that the tamponade reasonably could have extended the victim's life. He explained that there is no way to know how long the victim lived after the wound was inflicted but he disagreed with Dr. Glaser that the victim would have been dead within a minute. Rather, he thought it was possible the victim could have survived and functioned for a couple of minutes or even longer.

¶ 42 Also introduced at the Crim. P 35(c) hearing was evidence regarding a report prepared by the prosecution discussing a pretrial interview with Dr. Andrew Berson, an emergency room trauma surgeon. Dr. Berson's report, which had been provided to the defense during discovery, described the type of wound the victim suffered and opined that someone with that type of wound would bleed out between thirty seconds and a minute, versus someone with a smaller wound where cardiac tamponade could occur.

¶ 43 The postconviction court concluded that defendant did not establish that the failure to call a medical expert like Dr. Glaser or Dr. Berson constituted ineffective assistance of counsel. It found that Attorney 2 had researched the issue of survivability after a stab wound to the heart, interviewed Dr. Ritchey in person, and consulted two independent forensic pathologists in connection with Dr. Ritchey's anticipated testimony. The court concluded that this level of investigation and the subsequent decision not to retain a medical expert clearly met the standard of reasonably competent assistance. The court further found that it was probable that had the defense called Dr. Glaser or Dr. Berson at trial, the prosecution would have been permitted to call Dr. Bux in rebuttal. It concluded:

> Given the limitations on medically or scientifically putting specific time estimates [on] survivability, the consensus on the factors affecting survivability, the closeness of the medical experts' time estimates [regarding how long the victim could have lived after the stab wound], and evidence of the probable length of the fight, it is unlikely that testimony by Dr. Berson or Dr. Glaser would have had any impact on the result of the trial.

¶ 44 Defendant now argues that the postconviction court's conclusion that trial counsel's performance was not deficient in failing to call Dr. Berson at trial is erroneous. He claims the court failed to acknowledge the significance of Dr. Berson's potential testimony, which he asserts would have been exculpatory because Dr. Berson's survival time frame—between thirty seconds and one minute—rebutted and contradicted the prosecution's theory of guilt. He similarly argues that the court erred in not concluding that trial counsel was deficient for failing to hire an expert like Dr. Glaser.

¶ 45 Counsel has a duty to make reasonable investigations. *Strickland*, 466

U.S. at 691, 104 S.Ct. 2052. A reasonable investigation means one that is "sufficient to reveal potential defenses and the facts relevant to guilt." *Davis*, 871 P.2d at 773. The postconviction court's conclusion that trial counsel's pretrial investigation regarding the medical evidence was reasonable is supported by the record, and we decline to disturb it on review.

¶ 46 The United States Supreme Court explained in *Strickland* that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." 466 U.S. at 690, 104 S.Ct. 2052. In other words, if counsel's decision was strategic and adequately informed, defendant must overcome the "virtually unchallengeable" presumption that counsel's decision was objectively reasonable. *Bullock*, 297 F.3d at 1047 (internal quotation marks omitted).

¶ 47 The postconviction court's inference that counsel did not call a medical expert because they did not believe they could find a credible medical expert to rebut Dr. Ritchey is supported by the record: Attorney 2 testified at the Crim. P. 35(c) hearing that had the experts she consulted disagreed with Dr. Ritchey regarding how long defendant could have lived, they would have testified. Also, the record shows that counsel had the requisite knowledge, or had consulted with experts to the degree necessary to acquire such knowledge, to understand the significance of the medical evidence and to competently cross-examine the prosecution's experts regarding the evidence. *Cf. Pavel v. Hollins*, 261 F.3d 210, 224 (2d Cir.2001) ("[T]here is no indication in the record that [counsel] had the education or experience necessary to assess relevant physical evidence, and to make for himself a reasonable, informed determination as to whether an expert should be consulted or called to the stand."); *Hutchinson v. People*, 742 P.2d 875, 881 (Colo. 1987) ("Without [expert] assistance, an attorney may be unable to rationally determine technical and evidentiary strategy or to properly prepare for cross-examination of the prosecution's witnesses or for presentation or rebuttal of physical evidence.").

¶ 48 We therefore conclude that counsel's decision was strategic and adequately informed, and defendant has not overcome the "virtually unchallengeable" presumption that counsel's decision was objectively reasonable. *Bullock*, 297 F.3d at 1047 (internal quotation marks omitted); *cf. Pavel*, 261 F.3d at 223 (The decision not to call a medical expert to testify as to the significance of the physical evidence presented by the prosecution "might well have been beyond reproach if it had been based on appropriate strategic considerations, or if it had been made by [counsel] following a sufficient investigation.").

¶ 49 Nevertheless, defendant argues that counsel's performance was deficient in this regard because failure to present exculpatory evidence is ordinarily deficient unless some cogent tactical or other consideration justified it, and counsel offered no such explanation here. *See Griffin v. Warden*, 970 F.2d 1355, 1358 (4th Cir.1992); *see also Duncan v. Ornoski*, 528 F.3d 1222, 1234 (9th Cir.2008); *Richey v. Bradshaw*, 498 F.3d 344, 362 (6th Cir.2007); *Pavel*, 261 F.3d at 217–18. We disagree with defendant that testimony by Dr. Berson or Dr. Glaser necessarily would have been exculpatory.

¶ 50 All the medical experts agreed that it is not possible to say for sure how long the victim lived after he had been stabbed. Had Dr. Berson been called and testified that the victim would have died within thirty seconds to a minute, the jury would have had to weigh that testimony against testimony by Dr. Ritchey and Dr. Hertner that it is not possible to definitively determine how long the victim could have survived. Consequently, what weight the jury would have given such testimony is unclear.

¶ 51 Also, unlike the cases cited by defendant in which the evidence at issue could have determined the outcome of the case, other evidence that incriminated defendant existed that would not have been rebutted by favorable testimony on the medical evidence, such as defendant's statements about stabbing someone and the victim's blood on defendant's knife. *Cf. Duncan*, 528 F.3d at 1235 (counsel's failure to consult an expert regarding "potentially exonerating blood evidence" and present such evidence at trial was

objectively unreasonable); *Pavel*, 261 F.3d at 224–25 (in the face of a "glaring mismatch" between the physical medical evidence in the case and the allegations against the defendant, counsel's failure to consult an expert and to be prepared to call the expert at trial was objectively unreasonable); *Richey*, 498 F.3d at 363–64 (counsel's failure to consult with retained expert regarding whether the prosecution's conclusions were scientifically accurate, when testimony of other available experts would have "severely undermined" the case against the defendant, was deficient performance).

¶ 52 We therefore agree with the postconviction court that defendant has not shown that counsel's failure to call a medical expert constituted deficient performance under the first prong of *Strickland*. Because defendant has not established deficient performance, we do not address prejudice. *See Strickland*, 466 U.S. at 697, 104 S.Ct. 2052.

### 2. Crime Scene Analysis Expert

¶ 53 At trial, the prosecution presented testimony from Kimberly Bjorndahl, a crime scene technician who had conducted the bloodstain analysis and crime scene reconstruction in this case. At the Crim. P. 35(c) hearing, the defense called John Koziol, an expert in crime scene investigation analysis and reconstruction. Koziol testified that, based on the bloodstains found at the scene of the stabbing, the victim most likely sustained the stab wound at the location where the witnesses had seen Orgill and the victim fall to the ground during their fight. As to the bloodstains that were probably made before that point, he disagreed with Bjorndahl that they could not have come from other minor injuries the victim had suffered. Rather, he believed the source of those bloodstains was most likely blood from the victim's minor wounds. He did agree with Bjorndahl, however, that it was not possible to establish definitively, based on the bloodstains, from what wound or area of the body the blood came.

¶ 54 Oziol also testified that the absence of any of the victim's blood on defendant's jacket and the fact that Orgill was covered in blood made it more likely Orgill had stabbed

the victim. In contrast, Bjorndahl testified at trial that it was possible the assailant did not have any blood on his clothing. As to whether a knife found on the seat of the truck where the victim had been sitting after he was stabbed could have been the murder weapon, Bjorndahl testified that it was "not logical" because the knife was found in a closed position with no blood on the blade. Koziol testified the knife could have inflicted the wound during the victim's fight with Orgill. Koziol further expressed concern over how defendant's knife was handled when it was in police custody and stated that there was a large opportunity for contamination, in that the victim's blood could have been transferred to the blade of defendant's knife at that time.

¶ 55 The prosecution called Jeff Saviano, a forensic consultant who had worked with Bjorndahl on the case, to rebut Koziol's Crim. P. 35(c) hearing testimony. Saviano, qualified as an expert in crime scene reconstruction and bloodstain pattern, testified that he disagreed with Koziol on several points. Salviano testified that

- none of the victim's wounds other than the stab wound were capable of causing the bloodstains at the scene;
- the spot where Orgill and the victim fell to the ground was not necessarily where the victim was stabbed;
- just because defendant did not have blood on his jacket did not mean he had not stabbed the victim; and
- the police had not mishandled defendant's knife during processing and contamination was unlikely.

Saviano testified that his ultimate opinion was that it was equally likely that defendant or Orgill had stabbed the victim.

¶ 56 Attorney 2 testified that she did not think about hiring an expert in crime scene analysis because in her pretrial interview with Bjorndahl and in Bjorndahl's report, Bjorndahl stated she did not know exactly what happened and it was possible Orgill had stabbed the victim. Attorney 2 thus believed that parts of Bjorndahl's testimony would be very favorable to the defense and could independently establish reasonable doubt. More-

over, she effectively cross-examined Bjorndahl to make the point that Bjorndahl could not say for sure that defendant rather than Orgill stabbed the victim.

¶ 57 The postconviction court concluded that, considering Attorney 2's extensive experience in retaining experts in homicide cases and her thorough knowledge of the facts of the case, her failure to call a crime scene expert regarding bloodstain pattern analysis did not constitute deficient performance. The court further found that, as to prejudice, if both Koziol and Saviano had been called as witnesses at trial, it is likely that Saviano's testimony would have been far more persuasive because Saviano had far more training and expertise in the area of bloodstain pattern analysis than Koziol and Saviano's testimony was supported by other evidence. The court thus concluded that it was highly unlikely that, had the defense called a bloodstain pattern analysis expert such as Koziol at trial, the results of the trial would have been any different.

¶ 58 The postconviction court reached the same conclusion regarding defense counsel's failure to present expert testimony to rebut Bjorndahl's testimony that it was not logical the victim's knife caused the fatal wound. The court explained:

> Bjorndahl's opinion was ... based more upon logic than expertise. Koziol's opinion challenged that logic based upon a statement attributed to the victim [Schwartz testified that right before the fight the victim said something like, "I've got a knife, let's go"], not upon crime scene analysis expertise. The jury had all of the above facts and could draw its own conclusions.... Failure to call an expert on a matter more properly the subject of lay testimony is not ineffective assistance of counsel, and it is difficult to imagine how expert testimony on this matter would have affected the result of the trial.

¶ 59 Lastly, the postconviction court found that Koziol's testimony regarding potential contamination of defendant's knife was speculative and unpersuasive. Accordingly, the court concluded that the failure to call an expert on this issue did not constitute defi-

cient performance nor would it have changed the result of the trial.

¶ 60 We agree with the postconviction court that defendant has not shown that, in light of all the circumstances, counsel's failure to call a crime scene reconstruction expert was "outside the wide range of professionally competent assistance." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. "[T]rial counsel need not introduce expert testimony on his [or her] client's behalf if he [or she] is able effectively to cross-examine prosecution witnesses and elicit helpful testimony." *Reinert v. Larkins,* 379 F.3d 76, 95 (3d Cir. 2004). Given Attorney 2's justifiable belief that she could effectively cross-examine Bjorndahl, we conclude that counsel's decisions in this area were not objectively unreasonable, especially considering the postconviction court's finding, which is supported by the record, that Attorney 2 had extensive experience with experts in criminal trials. *See Williams v. Head,* 185 F.3d 1223, 1228 (11th Cir.1999) ("Our strong reluctance to second guess strategic decisions is even greater where those decisions were made by experienced criminal defense counsel." (internal quotation marks omitted)).

¶ 61 Because defendant has not established that counsel's performance was deficient for failing to call a crime scene analysis expert, we do not address whether defendant was prejudiced by this failure. *See Strickland,* 466 U.S. at 697, 104 S.Ct. 2052.

¶ 62 We therefore conclude that defendant has not established that counsel's failure to call medical and crime scene analysis experts constituted ineffective assistance.

D. Failure to Advise Defendant Regarding His Right to Testify

¶ 63 Defendant argues that his trial attorneys were ineffective because Attorney 1 labored under an actual conflict of interest affecting his ability to advise defendant on his right to testify and counsel failed to consult with and erroneously advised defendant regarding testifying. We reject defendant's arguments.

### 1. Conflict of Interest

¶ 64 At the time of trial, defendant was subject to a deferred sentence in a felony vehicular eluding case in which he was represented by Attorney 1. Under Colorado law, evidence of a guilty plea entered in a deferred sentencing stipulation may be used to impeach a defendant who has elected to testify. *People v. Vollentine,* 643 P.2d 800, 802 (Colo.App.1982). Defendant argues that Attorney 1 had an actual conflict of interest that foreclosed him from objectively determining whether there was a basis to collaterally attack the judgment or withdraw defendant's plea in the eluding case, particularly as pertained to whether Attorney 1 rendered ineffective assistance of counsel in that case.

¶ 65 A defendant may prevail on an ineffective assistance of counsel claim without establishing prejudice if he or she can show that an actual conflict of interest adversely affected the adequacy of trial counsel's representation. *Dunlap,* 173 P.3d at 1073; *see also Cuyler v. Sullivan,* 446 U.S. 335, 349–50, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). "A conflict of interest exists when the attorney's ability to represent a client is materially limited by the attorney's own interests." *People v. Delgadillo,* 2012 COA 33, ¶ 9, 275 P.3d 772. Conflicts are actual or potential, with an actual conflict of interest being one that is "real and substantial." *People v. Harlan,* 54 P.3d 871, 878 (Colo.2002) (internal quotation marks omitted).

¶ 66 The postconviction court found that no evidence was presented that the prospect of impeachment by the use of the guilty plea affected defendant's decision not to testify and that no evidence was presented that there was any defect in the guilty plea underlying the deferred judgment. These findings are supported by the record. Defendant thus cannot show that any conflict of interest on Attorney 1's part affected the adequacy of his representation because there is no evidence in the record that there was any legal basis to collaterally attack the deferred judgment or withdraw the plea, and thus nothing to suggest that doing so was a plausible defense strategy. *See United States v. Stantini,* 85 F.3d 9, 16 (2d Cir.1996) (to prove that a conflict adversely affected the adequacy of counsel's representation, the defendant must "demonstrate that some plausible alternative defense strategy or tactic might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests" (internal quotation marks omitted)); *see also Quince v. Crosby,* 360 F.3d 1259, 1264 (11th Cir.2004).

### 2. Failure to Consult and Erroneous Advice

¶ 67 Defendant argues that counsel failed to adequately consult with him and erroneously advised him regarding his right to testify, and their failure in this regard constituted deficient performance and prejudiced his defense. This is the extent of defendant's argument on appeal as to this issue.

¶ 68 The postconviction court found that Attorney 1 discussed the case with defendant on multiple occasions and Attorney 1's advice to defendant on this matter was within the range of competence demanded of attorneys in criminal cases. For these reasons and others, the court concluded defendant did not establish ineffective assistance of counsel. Because the court's findings are supported by the record, we decline to disturb the court's findings or conclusion. *See also People v. Venzor,* 121 P.3d 260, 264 (Colo.App. 2005) (declining to review issues presented in a perfunctory or conclusory matter).

### IV. Conclusion

¶ 69 The order is affirmed.

JUDGE CASEBOLT and JUDGE DAILEY concur.