2015 COA 174

**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Jason GARNER, Defendant–Appellant.**

**Court of Appeals No. 12CA0575**

Colorado Court of Appeals, Div. II.

Announced December 17, 2015

---

Cynthia H. Coffman, Attorney General, William G. Kozeliski, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Douglas K. Wilson, Colorado State Public Defender, Lynn Noesner, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant.

Opinion by JUDGE DAILEY

¶ 1 Defendant, Jason Garner, appeals the district court's order denying his Crim. P. 35(c) motion for postconviction relief. We affirm.

*I. Background*

¶ 2 Defendant filed a pro se motion for postconviction relief, in which he alleged various grounds for vacating his conviction and sentence for first degree murder.

¶ 3 Defendant's conviction arose out of a February 1998 incident that occurred when he and a female friend (the victim) drove to Gypsum, returning from Grand Junction. Defendant was aware that the victim had large amounts of methamphetamine and cash in her possession, and the two ingested methamphetamine at least three times within forty-eight hours of leaving Gypsum.

¶ 4 After visiting with friends in Grand Junction, the two left one evening to return to Gypsum. The next morning, defendant contacted the police and told them that, after the car in which he and the victim were travelling had gotten stuck on a back road, the victim had gotten lost in the woods. Within hours, police recovered the vehicle, but the victim's methamphetamine and cash were no longer inside.

¶ 5 In December 2002, almost five years later, a hunter and his son discovered the victim's remains at the bottom of a ravine

approximately two miles from where the vehicle was found in 1998.

¶ 6 In August 2003, defendant was arrested and charged with first degree murder of the victim. At trial, the prosecution presented (1) a forensic anthropologist, who opined that the victim suffered a perimortem [1] sharp force trauma injury, typical of a stab wound to the abdomen and consistent with one made by a single-edged knife; and (2) a forensic pathologist who, after collecting the victim's remains, examining them and the victim's medical history, and consulting with the forensic anthropologist, opined that the cause of death was the sharp force trauma injury identified by the anthropologist.

¶ 7 The prosecution also presented evidence that (3) defendant bought methamphetamine from the victim; (4) because she supplied him methamphetamine, the victim was able to exercise control over defendant; (5) before going on the trip, defendant had obtained an eight-inch single blade knife from a friend; (6) defendant never returned the knife; (7) defendant told others that he and the victim had been using methamphetamine and had gotten into an argument; (8) some of the victim's clothing had been cut in several places; (9) when his brother confronted him, saying, "you know you killed her. Why don't you just admit it?," defendant told him to "shut the fuck up"; (10) defendant told one individual that, after he had tried to scare the victim into giving him drugs, she had attacked him and he had accidentally stabbed her; and (11) defendant told a friend that he had killed the victim.

¶ 8 The prosecution's theory was that defendant, "crazed on methamphetamine, chased [the victim] down and stabbed her to death." Defendant denied killing her, testifying that, after their car had gotten stuck, they had become separated in the woods and that, once he was no longer able to hear her, he decided to go to the closest house and call for help. He also presented one witness who related a different description of the knife that had been provided to defendant; two witnesses to impeach the testimony of the

friend whom the prosecution had presented; three witnesses to testify to the effect drugs had on defendant (e.g., when on drugs, he would be "calm" or "mellow," not violent, and, when "coming down from drugs," he would be unable to recall things); and several other witnesses to testify to search and rescue efforts or the conditions of the areas where the car broke down and the victim was found.

¶ 9 The jury found defendant guilty as charged, and the trial court sentenced him to life imprisonment without the possibility of parole. A division of this court affirmed his conviction on direct appeal. *See People v. Garner*, 2006 WL 3028152 (Colo. App. No., Oct. 26, 2006) (not published pursuant to C.A.R. 35(f)).

¶ 10 Subsequently, defendant filed the pro se motion for postconviction relief that is the subject of this appeal. In his motion, defendant alleged, among other things, several claims of ineffective assistance of trial counsel. After determining that defendant's allegations were "of such a nature that the Court is unable to determine clearly ... that Defendant is not entitled to post-conviction relief," the court referred defendant's motion to the public defender's office for consideration. A public defender entered the case as postconviction counsel for defendant and filed a supplement to defendant's motion, in which counsel alleged six claims of ineffective assistance of trial counsel and requested an evidentiary hearing.

¶ 11 At the hearing, testimony was provided by two drug experts, both of defendant's trial counsel, a criminal defense investigator, a witness who had not testified at trial, an attorney who was an expert in criminal defense, and defendant himself. In an eighteen-page written order, the court denied defendant's motion for postconviction relief.

## II. Analysis

■ ¶ 12 On appeal, defendant contends that the postconviction court erred in denying his motion. Specifically, he asserts that

---

1. The anthropologist testified that "perimortem" meant "at, during, or slightly after the time of death."

the evidence at the postconviction hearing established that his trial counsel was ineffective for failing to (1) present evidence from experts in forensic anthropology, hypothermia, and the effects of methamphetamine use; (2) present a particular witness to impeach one of the prosecution's witnesses; (3) disclose a potential conflict of interest; and (4) ensure the jury was properly instructed as to voluntary intoxication.[2] We disagree.

### A. General Legal Principles and Standard of Review

¶ 13 "The constitutional right to effective assistance of counsel 'is not a guarantee against mistakes of strategy or exercise of judgment in the course of a trial as viewed through the 20–20 vision of hindsight following the return of a verdict in a criminal case.' " *People v. Gandiaga*, 70 P.3d 523, 525 (Colo.App.2002) (quoting *Dolan v. People*, 168 Colo. 19, 22–23, 449 P.2d 828, 830 (1969)).

¶ 14 To prevail on a claim of ineffective assistance of counsel, a defendant must show that (1) counsel's performance was deficient and (2) counsel's deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Dunlap v. People*, 173 P.3d 1054, 1062–63 (Colo. 2007).

¶ 15 In assessing the first prong of the *Strickland* test, courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)); *see Davis v. People*, 871 P.2d 769, 772 (Colo. 1994). Counsel's performance is deficient when, falling below "an objective standard of reasonableness," *Dunlap*, 173 P.3d at 1062 (quoting *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052), it amounts to "gross incompetence," *Kimmelman v. Morrison*, 477 U.S. 365, 382, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986); *see Le v.*

*Mullin*, 311 F.3d 1002, 1025 (10th Cir.2002) ("For counsel's performance to be constitutionally ineffective, it must have been 'completely unreasonable, not merely wrong, so that it bears no relationship to a possible defense strategy.' " (quoting *Hoxsie v. Kerby*, 108 F.3d 1239, 1246 (10th Cir.1997))).

¶ 16 To establish prejudice under the second prong of the *Strickland* test, the defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Dunlap*, 173 P.3d at 1063 (quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052).

¶ 17 To obtain relief, a defendant must prove, by a preponderance of the evidence, each prong of the *Strickland* test. *People v. Russell*, 36 P.3d 92, 95 (Colo.App.2001). If a court determines that counsel's performance was not constitutionally deficient, it need not consider the prejudice prong of the ineffective assistance of counsel test. *People v. Sparks*, 914 P.2d 544, 547 (Colo.App.1996). Similarly, if a court determines that a defendant failed to affirmatively demonstrate prejudice, it may resolve the claim on that basis alone. *People v. Garcia*, 815 P.2d 937, 941 (Colo.1991).

¶ 18 We review defendant's ineffective assistance of counsel claim as a mixed question of fact and law, giving deference to the court's factual findings as long as they are supported by the record, but reviewing the court's legal conclusions de novo. *People v. Valdez*, 178 P.3d 1269, 1278 (Colo.App. 2007); *cf. People v. Washington*, 2014 COA 41, ¶ 17, 345 P.3d 950 ("The postconviction court determines the weight and credibility to be given to the testimony of witnesses in a Crim. P. 35(c) hearing.").

¶ 19 With these principles and standard of review in mind, we now consider defendant's contentions.

### B. Failing To Present Expert Evidence

#### 1. Forensic Anthropologist

¶ 20 At trial, the prosecution presented testimony from two expert witnesses re-

---

**2.** Defendant raised additional claims of ineffective assistance of trial counsel in his postconviction motion. Because, however, he does not

reassert them on appeal, those claims are abandoned. *See People v. Aguilar*, 2012 COA 181, ¶ 36, 317 P.3d 1255.

garding the victim's cause of death. The first, a forensic anthropologist, testified that, upon examining the victim's body, she found a defect in the sacrum that was consistent with a single-edged knife wound travelling from the victim's abdomen back to her sacrum. She also testified that the defect was made perimortem and that a scavenging animal could not have left such a mark. The second witness, a coroner, relied on the forensic anthropologist's conclusion to opine that the cause of death was a homicide caused by a fatal stab wound.

¶ 21 Defense counsel planned to call a forensic anthropologist to rebut the prosecution's evidence; however, shortly before trial, the defense expert told counsel that she had changed her mind and now agreed with the position taken by the prosecution's forensic anthropologist.

¶ 22 The parties agree that counsel acted properly by not calling the defense forensic anthropologist to testify. *Vorgvongsa v. State*, 785 A.2d 542, 549 (R.I.2001) (When counsel's expert changed his opinion one week before trial, counsel "had no choice but to not call him to testify because [the expert]'s report now confirmed the accuracy of the state's ballistics report."). Defendant contends, however, that counsel was ineffective in not obtaining another expert to replace the first, reasoning that "[s]ince [the first witness] initially formed the opinion ..., it is reasonable to assume that other experts would also agree with her initial conclusion." We conclude that counsel was not, under the circumstances, ineffective.

¶ 23 At the postconviction hearing, the lead trial counsel expressed doubts about finding an expert to oppose the prosecution's theory that the defect in the victim's sacrum was caused by a knife: "We [now] had two very well-respected experts saying the same thing and I wondered [about] the likelihood of finding someone else to say something different." The other counsel testified that, even if they were able to find someone, "[w]e didn't think we could find anybody who would be very credible ... from a qualification sense to go up against [the prosecution's experts]." The prosecution's forensic anthropologist and the defense's forensic anthropologist were two of the three most preeminent experts in the western United States on the subject. *Cf. In re Gomez*, 180 Wash.2d 337, 325 P.3d 142, 152 (2014) ("[Counsel] was not required to search the entire country for experts....").

¶ 24 In addition to the issue of finding a new expert with the same or similar credentials as the prosecution's expert, trial counsel would have had to ask for a continuance from a judge who "did not grant continuances easily." And, even if they were granted a continuance, it would, in counsel's view, likely have been short given the timing of the request, and "[a] half a day wouldn't have been enough to go find another expert, interview that person, have that person review the material they needed to review, and I guess get past the Rule 16 deadlines for calling witnesses and things like that."

¶ 25 Lastly, a late request for a continuance would have required the defense to reveal its predicament to the prosecution and, whether the continuance was granted or denied, the defense ran the risk of the prosecution then asking the defense's former expert to testify regarding her newly formed opinion, further incriminating defendant with, now, the testimony of two of the three preeminent experts in the region. *See, e.g., Cullen v. Pinholster*, 563 U.S. 170, 243, n. 28, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011) (Sotomayor, J., dissenting) (noting that the State retained defense's expert as its own after the expert changed his opinion).

¶ 26 Notably, at the postconviction hearing, defendant's criminal defense expert was not asked whether counsels' decision to forego presenting evidence from a forensic anthropologist fell below the standard of reasonableness. Nor did defendant provide testimony from a forensic anthropologist who believed the defect was not a stab wound. Without evidence that such an expert exists, we cannot assume counsel acted unreasonably in foregoing the testimony shortly before trial. *Ingram v. State*, 2014 Ark. 350, 439 S.W.3d 670, 674 (Ark.2014) (The defendant's ineffectiveness claim failed because, "[w]hile appellant appeared to allege in a conclusory fashion that calling a different expert would have produced a different result at trial, he failed entirely to

provide any support for the claim that another expert would have come to a different conclusion...."); *State v. DiFrisco,* 174 N.J. 195, 804 A.2d 507, 524 (N.J.2002) ("[C]ounsel made a reasonable, tactical decision ... not to replace [their expert] ... [and] would have been reasonable in expecting that another expert would have arrived at a like conclusion.").

¶ 27 Under the circumstances, we conclude that it was entirely reasonable for trial counsel to proceed in the cautious manner in which they did. *See Ouber v. Guarino,* 293 F.3d 19, 28 (1st Cir.2002) ("It is easy to imagine that, on the eve of trial, a thoughtful lawyer may remain unsure as to whether to call ... a witness. If such uncertainty exists, however, it is an abecedarian principle that the lawyer must exercise some degree of circumspection.").[3]

### *2. Expert on Hypothermia*

■ ¶ 28 Trial counsel planned to call a hypothermia expert to testify about "what the phases of [hypothermia] are and what sort of behaviors can manifest in a person who's suffering from hypothermia." In consulting with the expert, the defense wanted "to figure out if there was an answer to [the victim] being where she was. Could she have wandered off. Could she have removed her own clothing. Could she have died from exposure."

¶ 29 As one of the trial counsel explained, however, the expert "had a very specific timeline that he wanted us to comply with ... and we couldn't accomplish it.... And it was, as I recall, a bit contentious." Rather than enforce the expert's subpoena, trial counsel chose not to call the expert because "it was a concern to us that his testimony might not be as helpful or impactful to the jury ... because of his being unhappy with the schedule situation."[4] The other trial counsel expressed similar concerns: "I was

concerned that if we were to have [the expert] escorted to the courthouse ... by a sheriff's deputy how that would affect his testimony."

¶ 30 According to both trial counsel, calling this particular expert was a "risk" and much of what they wanted to establish regarding hypothermia and its effects had already been established through the testimony of other witnesses. Thus, trial counsel decided not to have the hypothermia expert testify.

¶ 31 The postconviction court determined that "[d]efendant has not shown that counsel's decision not to call [the expert] was unreasonable." It reached that decision, in part, because "[d]efendant offered no evidence or argument addressing the reasonableness of counsel's concerns" and "[m]ore importantly, evidence of hypothermia was not that important to the defense." In this latter regard, the court noted that (1) trial counsel made no reference to hypothermia in their opening statement, which was given *before* counsel had any reason to believe that the expert would be unwilling, at that time, to testify;[5] and (2) given compelling evidence from the prosecution's experts that the victim "was *in fact* killed by stabbing, testimony that someone outdoors under the circumstances *could have* died from cold exposure would have been of limited value."

¶ 32 Defendant contends that the postconviction court's ruling "missed the larger point":

[H]ypothermia should have been central to the defense. Having both a forensic anthropologist and a hypothermia expert would have substantiated [defendant]'s innocence and provided a natural cause of death. In forfeiting both of these experts at the eleventh hour, [defendant] lost his best defense and the most persuasive, coherent theory of the case.

---

**3.** "Abecedarian" means "rudimentary." *Webster's Third New International Dictionary* 3 (2002).

**4.** Counsel was particularly concerned with offering "impactful" testimony because the trial took place through early-to mid-December, with the holiday season approaching.

**5.** In opening statement, counsel said, "we don't know where [the victim] went from there. We may never know how [she] died or who or what caused her death."

¶ 33 Defendant's argument as to the importance of hypothermia as a potential non-homicidal cause of death depends, then; on the admission of forensic evidence supporting the proposition that the victim was not stabbed to death.[6]  Previously, however, we noted that the defense did not have, would most likely have been unable to timely find, and had (as of the postconviction hearing) not produced credible experts to testify in support of that proposition.  Thus, the subject of hypothermia as a potential cause of death was not central to the case.

¶ 34 Defendant also contends that hypothermia should have been central to the case because "evidence of its effects would have explained [his] actions and supported his credibility."  The record reflects that trial counsel had initially sought to call the hypothermia expert to help explain the victim's, not defendant's, behavior—for example, "why there were items of clothing that she had removed."  How hypothermia may have affected defendant's actions of walking to someone's home to get help, calling the police, and telling varying stories about what happened were not, apparently, what trial counsel had in mind for the expert.

¶ 35 That said, as the postconviction court found, defendant "did not present any evidence at the hearing that [the expert] would have been able to testify definitively that the Defendant was suffering from hypothermia or that it could explain his giving such wildly different versions of events."

¶ 36 Notably, in closing argument, trial counsel suggested that variations in defendant's statements could have been attributable to being "out in the cold in the middle of February trying to recall what happened," apparently playing off of evidence the defense team had elicited from a detective that

people act irrationally "when [they] get really cold."[7]

¶ 37 In light of
- the tension between counsel and the witness;
- counsels' concern about keeping the jury engaged with "impactful" testimony;
- the unlikelihood of the court, ten days into trial, granting a continuance to allow the witness to testify, in effect, at a more convenient time;
- hypothermia not being "that important" to the defense; and
- the strong presumption that counsels' conduct fell within the wide range of reasonable professional assistance,

we cannot conclude that the decision to forego the hypothermia expert's testimony fell below the objective standard of reasonableness necessary to establish deficient performance on counsels' part.  Consequently, defendant is not entitled to relief on this ground.

### 3.  Experts on the Effects of Methamphetamine Use

■ ¶ 38 Defendant contends that trial counsel was ineffective for not presenting experts who would have testified that methamphetamine use distorts perception and memory to explain why defendant gave varying statements about the events leading up to the victim's disappearance.

¶ 39 At the postconviction hearing, two experts related that they were prepared to testify on behalf of the defense at trial.  The first expert, a certified addiction counselor and director of a rehabilitation program, recounted that, because methamphetamine use can cause "whiteouts" (the equivalent of an alcohol-induced blackout), "[i]t's very common to run into someone that's had lost periods of time under the effect of long-term

---

6. There is no suggestion in the record or in defendant's briefs that the hypothermia expert would have testified that the victim died of hypothermia rather than of a stab wound.  Neither this expert, nor any other expert on hypothermia, testified at the postconviction hearing.

7. The detective testified, with respect to the victim:

[W]hen people get really cold, they, for whatever reason, take off their clothes because they think they're warm when they're really freezing.  So because we had nothing else really to work from, that was the only theory that we came to was, well, maybe she's freezing to death and takes the coat off.

use and heavy use of methamphetamine." On cross-examination, he stated that he also would have testified about the paranoid delusions and violent behavior methamphetamine use can cause.

¶ 40 The second expert, a clinical psychologist specializing in addiction, testified that it would be "typical" for someone in a psychotic state under the influence of methamphetamine to struggle to remember things accurately, and that the person "may even try and fabricate, fill in the blanks of what they think might have occurred." He also said that someone in a psychotic state would not be using good judgment, which could explain why defendant was not properly dressed for a winter road trip. On cross-examination, the expert acknowledged that, had he been called to testify at trial, he would have said that "crazy people do crazy things" and that "when someone's under the influence of methamphetamine, they're in an agitated, sometimes paranoid state, and the likelihood of them behaving violently is increased."

¶ 41 Both trial counsel testified that, following their consultations with these experts, they ultimately decided not to have them testify at trial. One counsel testified that, in deciding not to call either expert, he and his co-counsel believed "that the harmful things ... may outweigh any of the good things" the experts could testify about. The second counsel agreed, stating that she was "really afraid that by putting either one of those gentlemen on, that was just going to give additional information to [the] prosecution to support [their] theory" that defendant killed the victim in a drug-fueled rage.

¶ 42 Defendant's criminal defense expert did not, in his testimony, address whether trial counsels' decision was reasonable. The postconviction court, however, left no doubt about its views of the propriety of counsels' decision:

> For defense counsel to put on additional evidence from experts of the violent, aggressive, delusional, paranoid tendencies of methamphetamine users would merely bolster the prosecution's position and undermine the Defendant's testimony that he was not violent when he ran out of methamphetamine. The Defendant certainly

has not shown that the beneficial evidence these two witnesses could have offered so outweigh[s] these negative considerations as to make it unreasonable not to call them.

¶ 43 We perceive no error in the postconviction court's determination that counsels' decision was "perfectly reasonable" under the circumstances. *See People v. Newmiller,* 2014 COA 84, ¶ 48, 338 P.3d 459 (Counsel's decision not to call an expert to testify "was strategic and adequately informed, and defendant has not overcome the 'virtually unchallengeable' presumption that counsel's decision was objectively reasonable." (quoting *Bullock v. Carver,* 297 F.3d 1036, 1047 (10th Cir.2002))); *People v. Bradley,* 25 P.3d 1271, 1276 (Colo.App.2001) ("[T]he tactical decision not to call ... an expert witness was within the discretion of trial counsel and does not support defendant's claim of ineffective assistance of counsel."); *see also Harrington v. Richter,* 562 U.S. 86, 108–09, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011) (concluding that an attorney's decision not to pursue expert testimony was a sound strategy under *Strickland* because such testimony could have had negative consequences for the defense); *United States v. Maxwell,* 966 F.2d 545, 548–49 (10th Cir.1992) ("Because countless ways exist to provide effective legal assistance in any given case," counsel's decision not to call a substance abuse expert to testify as to "addict[ ] behavior" did not "fall below professional standards of reasonableness.").

### C. Failing To Call a Particular Impeachment Witness

¶ 44 At trial, the prosecution called defendant's friend (the friend) to testify that defendant admitted to him that he had murdered the victim. After being detained in jail himself, the friend relayed defendant's statements to a detective and testified to them before a grand jury. At trial, however, the friend claimed not to remember having heard the information from defendant, telling the detective what he had heard, or testifying about the conversation before a grand jury. After the prosecution confronted the friend with the statements he had made, the prosecution introduced those statements, as sub-

stantive evidence of defendant's guilt, through the testimony of a detective. *See* § 16–10–201, C.R.S. 2015 (addressing admissibility of prior inconsistent statements for impeachment and substantive proof purposes).

¶ 45 To undermine the credibility of the friend's prior statements, defense counsel called two witnesses who had been in jail with the friend at the time he came forward with the information. The first witness, Mr. Z., testified that the friend approached him wanting to know if he would like to get in on the "scam" to testify that defendant admitted to murdering the victim in exchange for receiving a shorter sentence. The second witness, Mr. T., testified that the friend had said he "had heard ... bits and pieces of the story and that he thought he knew enough that he could ... put together a fabricated story well enough to get time off his sentence." Because Mr. T. testified that some of the "bits and pieces" of the story came from yet another person, Mr. K., defendant argues trial counsel should have called Mr. K. to verify that he did, in fact, provide the friend with that information.

¶ 46 At the postconviction hearing, Mr. K. said that he was willing, at the time, to testify for defendant because he thought it was wrong for the friend to lie in order to help his own cause. To support this testimony, postconviction defense counsel admitted into evidence a letter Mr. K. had written to defendant stating his willingness to testify. Defendant testified that he gave this letter to one of his trial counsel, who said that he did not recognize the letter. The letter, nonetheless, was found in defendant's case file.

¶ 47 Defendant's criminal defense expert expressed no opinion about whether it was unreasonable for trial counsel to forego calling Mr. K. to testify. One of defendant's trial counsel thought Mr. K.'s testimony was unnecessary based on counsel's impression of the friend's testimony and the jurors' response to it: counsel "didn't think there was anyone in the room, jurors included, who

really would believe anything [the friend] had to say." Further, counsel said, "if I had my choice between witnesses to come in and testify for my case, [Mr. K.] wouldn't be on the top of my list...." Mr. K. was readily impeachable: he had three felony convictions as of 2004 and had met defendant in the "drug scene."

¶ 48 Because trial counsel impeached the friend's prior statements with the testimony of two inmates, counsels' failure to call yet another inmate to impeach him, particularly given that inmate's criminal record, was not unreasonable. *See Arko v. People*, 183 P.3d 555, 558 (Colo.2008) (Decisions that are "strategic or tactical in nature ... [are] reserved to defense counsel ... [and] include what witnesses to call (excepting the defendant) ...." (citations omitted)).

¶ 49 Nor, in any event, was defendant prejudiced by counsels' decision. As the Attorney General argues, there was "no reasonable probability that calling one more jailhouse snitch, who was [also] defendant's friend, would have discredited [the friend's prior statements] to such an extent that it would have mattered in the end."[8] *See Ardolino v. People*, 69 P.3d 73, 76 (Colo.2003) (In the *Strickland* context, "a reasonable probability means a probability sufficient to undermine confidence in the outcome."); *see also Pinholster*, 563 U.S. at 239, 131 S.Ct. 1388 (finding no prejudice where additional evidence "largely duplicated" other evidence and was of "questionable mitigating value"); *People v. Rivas*, 77 P.3d 882, 893–94 (Colo. App.2003) (finding no prejudice from counsel's failure to call witnesses who were willing to testify for defendant because their testimonies were impeachable on multiple grounds and would have been duplicative of similar testimony already admitted at trial).

¶ 50 For these reasons, defendant was not entitled to relief on this ground.

### D. Conflict of Interest

██ ¶ 51 Defendant's lead trial counsel was appointed to represent him in this case

---

8. In this regard, the postconviction court noted that "[e]ven if [trial] counsel should have done more to undermine [the friend's] credibility, the Defendant cannot show prejudice because [the friend] was not [a] key witness ... [and] the jury could easily have disbelieved [him] and nevertheless convicted the Defendant as [it] did."

in August 2003. She had previously represented the potential defense witness mentioned above, Mr. K., in an entirely separate case and continued to represent him until he was sentenced in September 2003. Defendant asserts that this roughly one-month overlap of representation, as well as counsel's continuing duties of loyalty and confidentiality to her former client, the potential witness, constituted a conflict of interest that should have been disclosed to defendant. We disagree.

■ ¶ 52 A conflict of interest claim is a species of ineffective assistance of counsel claims, see People v. Nozolino, 2013 CO 19, ¶ 12, 298 P.3d 915, but a peculiar one, at that. In contrast to the Strickland standard that applies for other ineffective assistance claims, a successful conflict of interest claim requires a showing only that counsel was subject to an actual conflict of interest that adversely affected his or her performance. Cuyler v. Sullivan, 446 U.S. 335, 348–50, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); Dunlap, 173 P.3d at 1073.

■ ¶ 53 A conflict of interest exists when an attorney's ability to represent a client is materially limited by the attorney's responsibility to another client or to a third person. People v. Edebohls, 944 P.2d 552, 556 (Colo.App.1996); see Colo. RPC 1.7. In this regard, a conflict of interest can arise when one attorney simultaneously represents a defendant and a witness in that defendant's trial. West v. People, 2015 CO 5, ¶ 16, 341 P.3d 520. Similarly, a conflict may arise when an attorney has previously represented a trial witness, as such " 'successive representation' may restrict the attorney's present representation of the defendant 'because of the [attorney's] duty to maintain the confidentiality of information' that he received in his prior representation of the trial witness." Id. at ¶ 17 (quoting Rodriguez v. Dist. Court, 719 P.2d 699, 704 (Colo.1986)) (alteration in original).

■ ¶ 54 The Sixth Amendment right to conflict-free counsel embraces only the right to be free from "actual," not "possible," conflicts of interest. See id. at ¶ 18 ("A defendant seeking post-conviction relief based on

ineffective assistance of counsel resulting from an attorney's alleged conflict 'must demonstrate that an actual conflict of interest adversely affected his lawyer's performance.' " (quoting Cuyler, 446 U.S. at 348, 100 S.Ct. 1708)).

¶ 55 The actual conflict of interest required under the Sixth Amendment "is more than a theoretical conflict." Anderson v. Comm'r of Corr., 127 Conn.App. 538, 15 A.3d 658, 666 (Conn.App.Ct.2011), aff'd, 308 Conn. 456, 64 A.3d 325 (Conn.2013); see Shefelbine v. Comm'r of Corr., 150 Conn.App. 182, 90 A.3d 987, 994 (Conn.App.Ct.2014) ("A mere theoretical division of loyalties is not enough.") (citation omitted). It is "a conflict of interest that adversely affects counsel's performance." West, ¶ 28 (quoting Mickens v. Taylor, 535 U.S. 162, 211, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002)); see also United States v. Rodrigues, 347 F.3d 818, 824 (9th Cir.2003) (noting that, in the Sixth Amendment context, " 'actual conflict' is a term of art defined by reference not to the nature of the alleged conflict itself, but to the effect of the conflict on the attorney's ability to advocate effectively").

■ ¶ 56 To show a qualifying "actual conflict," then, "a defendant ... must show (1) that counsel had a conflict of interest (2) that adversely affected the representation." West, ¶ 28 (citation omitted). Defendant, however, failed to meet this burden.

¶ 57 At the postconviction hearing, defendant's criminal defense expert testified that "once counsel's aware of either an actual or a potential conflict, [he or she] must inform the Defendant of the nature of the conflict [and] must describe in plain terms the specific ways in which the conflict may affect counsel's ability to effectively represent the Defendant." (Emphasis added.) A conflict of interest could have arisen in this case, the expert said, because if Mr. K. had been endorsed as a defense witness for defendant, it could have harmed his plea negotiations with the prosecution in his own case. Thus, trial counsel could have found herself "in a position of having to decide 'do I want to help [defendant] with [Mr. K.] being a witness or do I want to make sure that [Mr. K.] doesn't get hurt in his case by becoming a defense

witness in the other case.'" Once trial counsel was in a position where she had to weigh different clients' interests, she had a conflict which should have been discussed with other clients.

¶ 58 Defendant, however, failed to present any evidence of when trial counsel became aware that Mr. K. was a potential witness in defendant's case. Mr. K. testified that he did not contact either of defendant's trial counsel, nor did he "take any affirmative steps to share that information with anybody other than writing [the] letter" to defendant.

¶ 59 True, Mr. K.'s letter was found in defendant's case file; but, defendant presented no evidence as to who placed the letter there or when. Although defendant said he gave the letter to one counsel, that counsel related that it didn't "look or sound familiar" to him. The other counsel—the one with the purported conflict—said that she did not recognize the letter. Because neither of defendant's trial counsel testified to possessing the letter at any time, we cannot assume that the one counsel was aware, prior to her previous client's sentencing, of that client's willingness to testify on defendant's behalf.

¶ 60 Moreover, even if the lead counsel had received the letter or been made aware of its contents in a timely fashion, her representation of Mr. K. would not have conflicted with her representation of defendant. We note, as did the postconviction court, that the "[t]rial in this case took place well over a year after [Mr. K.]'s sentencing. This allowed plenty of time for counsel to have become aware of [Mr. K.] as a potential witness well after [counsel]'s representation of him terminated."

¶ 61 Although, as defendant asserts, attorneys must retain duties of loyalty and confidentiality to their former clients under Colo. RPC 1.9, the record does not indicate that any confidential information trial counsel would have acquired while representing Mr. K. had any relevance to defendant's case. Without some link between the two cases, representing the potential witness in a separate, earlier matter would not have restricted counsel's representation of defendant in this case. *See West,* ¶ 17; *see also Pina v. State,* 29 S.W.3d 315, 318 (Tex.App.2000) (Because,

in part, "there was no evidence showing trial counsel had a continuing obligation to the witness [he previously represented]," there was no actual conflict of interest.).

¶ 62 Further, if he had testified, Mr. K. would not have been an adverse witness to defendant. Rather, he said that he wrote the letter because he "felt it was kinda wrong ... that [the friend] would make up some stories to get out of his trouble." Because Mr. K. would have testified for defendant to impeach one of the prosecution's witnesses, trial counsel would not have cross-examined Mr. K. Thus, the typical concern in conflict of interest cases—an attorney's inability to cross-examine a former client who is testifying on behalf of the prosecution while currently representing the defendant—is not present here. *See People v. Samuels,* 228 P.3d 229, 240 (Colo.App.2009) ("[T]he duty of confidentiality that survives the termination of an attorney-client relationship ... creates the possibility that the attorney will be hindered in cross-examining the witness, which thus impedes the attorney's ability to zealously represent the current client." (quoting *Dunlap,* 173 P.3d at 1070)); *State v. Kelly,* 164 So.3d 866, 879 (La.Ct.App.2014) (Defense counsel was not "forced to labor under an actual conflict with clearly divided loyalties" where the witness testified for the defendant and counsel previously represented the witness in a limited capacity for an unrelated matter.).

¶ 63 In light of these considerations, we conclude that the postconviction court correctly determined that defendant had not shown an actual conflict of interest adversely affecting his counsel's performance. Consequently, defendant was not entitled to relief on this ground either.

*E. Inadequate Intoxication Instruction*

¶ 64 The prosecution's theory was that defendant killed the victim while "crazed on methamphetamine." The jury was instructed on the elements of first degree murder, second degree murder, and manslaughter. At the prosecution's request, the jury was instructed that "[d]iminished responsibility due to self-induced intoxication is not a

defense to murder in the second degree or manslaughter."

¶ 65 Defendant asserts that this was but a partial instruction regarding intoxication law, and that trial counsel should have either (1) objected, on that ground, to the instruction; or (2) requested that the jury be fully and properly instructed that voluntary intoxication is a defense to the charged crime in this case, first degree murder.

¶ 66 At the postconviction hearing, trial counsel was asked why she chose not to ask to have the jury instructed on voluntary intoxication as it related to the first degree murder charge. Counsel testified that the defense's theory of the case was that defendant had not killed the victim, and an intoxication instruction "would not have been consistent" with that theory. She also testified that she did not consider voluntary intoxication a viable theory because, in her thirty years of experience as a defense attorney, she did not "think that that's a defense juries like." In light of the defense's theory, she stated that she did not request the voluntary intoxication instruction because she "could not have argued, one, that [defendant] did not kill [the victim], and two, if he did, he ... didn't have the requisite mental state. We could ... only pick one and have any kind of credibility with the jury."

¶ 67 This was a reasonable explanation for not injecting the subject of intoxication into the case. *See People v. Villarreal,* 231 P.3d 29, 35 (Colo.App.2009) (finding whether to request a voluntary intoxication instruction is a strategic decision within counsel's purview), *aff'd on other grounds,* 2012 CO 64, 288 P.3d 125; *see also Jackson v. Shanks,* 143 F.3d 1313, 1320 (10th Cir.1998) ("[C]ounsel's failure to seek an intoxication instruction was reasonable, because the instruction would have conflicted with his chosen trial strategy.").

¶ 68 But that explanation does not apply where, as here, the subject of intoxication had already been injected into the case via an instruction. In this instance, counsel could have asked to have the jury fully instructed on intoxication as it relates to first degree murder without the jury knowing that the instruction had been requested by the defense. *See People v. Welsh,* 176 P.3d 781, 788 (Colo.App.2007) ("[T]rial courts are to refrain from distinguishing between the 'court's instructions' and the 'defendant's instruction'...."). That would have allowed the defense to rely, in argument, solely on the position that defendant did not kill the victim, while, at the same time, allowing for the possibility that the jury would convict him of a lesser offense if it found that he did.

¶ 69 Nonetheless, it was for defendant to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *People v. Vicente-Sontay,* 2014 COA 175, ¶ 18, 2014 WL 7446929 (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052, in turn quoting *Michel,* 350 U.S. at 101, 76 S.Ct. 158). Defendant did not attempt to do so here. He did not ask his criminal defense expert whether trial counsels' failure to seek a complete instruction on intoxication was a decision falling within the reasonable standard of practice for a criminal defense attorney in Mesa County. Nor did defendant present any argument on the matter at the postconviction hearing.

¶ 70 Moreover, in applying the presumption that the challenged action might be considered sound strategy, courts are "required not simply to give [the] attorneys the benefit of the doubt, but to affirmatively entertain the range of possible reasons ... counsel may have had for proceeding as they did." *Pinholster,* 563 U.S. at 196, 131 S.Ct. 1388 (alteration in original) (citation omitted); *see Gordon v. United States,* 518 F.3d 1291, 1301 (11th Cir.2008) (To overcome the presumption that counsel rendered reasonable and adequate assistance, "a petitioner must establish that no competent counsel would have taken the action that his counsel did take." (quoting *Chandler v. United States,* 218 F.3d 1305, 1315 (11th Cir.2000) (en banc))); *Holloway v. State,* 2013 Ark. 140, 426 S.W.3d 462, 467 (Ark.2013) (The defendant "has the burden of overcoming this presumption by identifying specific acts or omissions of counsel that, when viewed from counsel's perspective at the time of trial, could not have been the result of professional judgment."); *see also Richter,* 562 U.S. at

110, 131 S.Ct. 770 ("*Strickland* ... calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind."); *Cofske v. United States*, 290 F.3d 437, 444 (1st Cir.2002) (Because the test is objective, "as long as counsel performed as a competent lawyer would, his or her detailed subjective reasoning is beside the point."); *Dorsey v. State*, 448 S.W.3d 276, 295 n. 13 (Mo.2014) ("The fact that [counsel] could not explain why he did not contact [a particular expert] does not necessarily mean he was ineffective. The *Strickland* test for ineffectiveness is an objective one: What would a reasonably competent attorney do in a similar situation? So long as [counsel] performed as a reasonably competent attorney would, his subjective reasoning behind his performance is irrelevant.") (citation omitted); *Commonwealth v. Philistin*, 617 Pa. 358, 53 A.3d 1, 29 n.23 (Pa.2012) ("[I]nstead of limiting ourselves to those strategies counsel says he pursued, we determine whether there was any objectively reasonable basis for counsel's conduct.").[9]

¶ 71 Here, we perceive possible reasonable strategic grounds for not having the jury completely instructed on the subject of voluntary intoxication. Leaving the instruction as it was allowed the jury to infer that, inasmuch as self-induced intoxication was not a defense to the other charges, it would be a defense to first degree murder.[10] The point that defendant wishes was explicitly included in the instruction was nonetheless implicitly conveyed to the jury.

¶ 72 Any attempt to explicitly include that point in the instruction would have been problematic. Under the law, voluntary intoxication is not, in and of itself, a defense to first degree murder. It is only "a partial defense that, *under appropriate circumstances*, negates the specific intent necessary to carry out certain offenses." *Brown v. People*, 239 P.3d 764, 769 (Colo.2010) (emphasis added); *see* § 18-1-804, C.R.S. 2015; *People v. Miller*, 113 P.3d 743, 750 (Colo. 2005) (noting that, under section 18-1-804, evidence of voluntary intoxication may be offered to negate the specific intent elements of first degree "after deliberation" murder).

¶ 73 A proper and complete instruction on voluntary intoxication would have informed the jury that it would not be a ground for acquitting defendant of first degree murder *unless* defendant's intoxication was shown to have had a specific effect, i.e., that because of intoxication, defendant did not form the requisite specific intent. The absence of a proper and complete instruction allowed the jury to acquit defendant of first degree murder based on intoxication alone—and without having to consider whether the intoxication had the requisite effect (negating one or the other specific intent elements of first degree murder).

¶ 74 Allowing the jury to conclude that voluntary intoxication was a defense to first degree murder effectively put defendant in a better position than if the court had expressly limited the application of this defense.

**9.** We recognize that this is a view that is not universally held across the country. *See Tice v. Johnson*, 647 F.3d 87, 105 (4th Cir.2011) ("[C]ourts should not conjure up tactical decisions an attorney could have made, but plainly did not.") (citation omitted); *Young v. United States*, 56 A.3d 1184, 1198 (D.C.2012) ("A reviewing court must rely upon trial counsel's actual decision-making process, ... rather than invent a *post hoc* rationalization ....") (citation omitted). But it is, we think, more consistent with the Supreme Court's decisions in *Cullen v. Pinholster*, 563 U.S. 170, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011), and *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011), where the reasonableness of counsels' actions was upheld based on considerations to which counsel had never alluded.

The Court in *Richter* did, however, somewhat limit the type of additional matters that could be considered when it said that courts should "not indulge *post hoc* rationalization for counsel's decisionmaking *that contradicts the available evidence*...." 562 U.S. at 109, 131 S.Ct. 770 (emphasis added) (citation omitted). The reasons on which we rely here do not contradict anything trial counsel said at the postconviction proceeding: counsel were not asked about—and thus did not provide any reason for—not requesting a more complete treatment of the subject of intoxication once it was injected into the instructions.

**10.** The postconviction court recognized this when it found that, "[i]f anything, the fact that first-degree murder was omitted from this instruction would logically lead the jury to conclude that voluntary intoxication *was* a defense to that charge in contrast to the others that were mentioned." (Emphasis added.)

Consequently, a plausible reason exists for trial counsels' not having asked for a full and proper instruction on voluntary intoxication, and defendant cannot demonstrate that counsels' performance was constitutionally deficient. Thus, defendant is not entitled to relief on this ground. *See, e.g., People v. Gioglio,* 296 Mich.App. 12, 815 N.W.2d 589, 597 (Mich.Ct.App.2012) ("[I]f, after affirmatively entertaining the range of possible reasons for the act or omission," a reviewing court determines that "there might have been a legitimate strategic reason for the act or omission," it must conclude that the act or omission fell within the range of reasonable professional conduct.), vacated in part on other grounds, 493 Mich. 864, 820 N.W.2d 922 (Mich.2012).

### III. Cumulative Error

¶ 75 Finally, because we do not find any individual error, defendant is not entitled to reversal on a theory of cumulative error. *See People v. Fears,* 962 P.2d 272, 285 (Colo. App.1997) ("Since we found no error that substantially prejudiced the defendant's right to a fair trial, there is no error to compound.").

### IV. Conclusion

¶ 76 The order is affirmed.

JUDGE BOORAS and JUDGE NAVARRO concur.