23CA1911 Peo v Linton 01-08-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA1911
Adams County District Court No. 15CR3429
Honorable Mark D. Warner, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Byron Linton,

Defendant-Appellant.

---

ORDER AFFIRMED

Division III
Opinion by JUDGE KUHN
Dunn and Lipinsky, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced January 8, 2026

---

Philip J. Weiser, Attorney General, William G. Kozeliski, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Mulligan Breit, LLC, Patrick J. Mulligan, Denver, Colorado; Daniel R Kent
Esquire, LLC, Daniel Kent, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Byron Linton, appeals the postconviction court's denial of his Crim. P. 35(c) motion without a hearing.  We affirm.

## I.     Background

¶ 2     We draw the following background information from the testimony and evidence presented at trial.  One evening, Linton pulled his semi-truck up behind the victim, who was standing next to his parked car at a gas station air pump.  The victim's car was blocking Linton's access to a weigh scale located next to the air pump.  Once the victim finished using the pump, he waved to Linton, gave him a thumbs up, and gestured to the pump.  As the victim went to get back into his car, Linton got out of his truck and quickly walked up to the victim.

¶ 3     Linton stopped a foot or so away from the victim and angrily gestured at him, telling the victim that Linton needed to weigh his truck on the scale.  They began to argue, and the victim stepped back — away from his car and off a curb — putting space between the two of them.  Linton then stepped forward in between the victim and his car.  Linton reached for his right waistband, and as he did so, the victim stepped back onto the curb.  The victim, who believed that Linton was reaching for a gun, said "Oh, you going to shoot

me, you're going to shoot me."  Linton swiftly pulled a gun from his hip holster and shot the victim in the lower right abdomen.

¶ 4     The victim collapsed to the ground as Linton holstered his gun in one smooth motion while stepping back.  Linton then stepped forward and leaned over the victim.  At trial, the victim testified that Linton said, "You see what you made me do.  You see what you made me do."  The victim, trying to keep Linton calm, replied, "Sir, just I understand like, I wasn't going to do anything like."  And Linton then said, "I didn't mean to do it.  I didn't mean to do it."  Linton started to walk away as the victim crawled back towards his car but then returned to say something else.  Linton then left the victim on the ground and got back into his truck.  Some bystanders came over, contacted emergency services, and provided aid to the victim.  Linton spoke with some of the bystanders, but he did not call emergency services or attempt to aid the victim himself.  The victim was taken to a hospital and survived.

¶ 5     The gas station's video-only camera recorded the entire incident, although the footage is somewhat blurry.  Approximately twenty seconds passed between Linton parking his truck and shooting the victim.  The victim was unarmed and, based on

testimony at trial, at no point attacked Linton or threatened him verbally or physically.

¶ 6     At trial, Linton argued that he drew the gun in self-defense, focusing on his fear of the victim, Linton's reduced physical capacity, and his hearing loss, which led him to misunderstand what the victim was saying. He also argued that he did not intend to shoot the victim. The jury convicted him of attempted second degree murder and first degree assault. The court sentenced Linton to twenty years in the custody of the Department of Corrections on each count, running concurrently.

¶ 7     Linton filed an appeal, and a division of this court affirmed the judgment of conviction. *See People v. Linton*, (Colo. App. No. 17CA0382, Nov. 12, 2020) (not published pursuant to C.A.R. 35(e)). He then filed a motion to reconsider his sentence under Rule 35(b), which the postconviction court denied. He later filed a Rule 35(c) petition in which he alleged ineffective assistance of counsel and that the court did not accommodate his hearing loss disability. He also sought a review of his sentence for gross disproportionality. The postconviction court denied his Rule 35(c) petition without holding a hearing.

## II.    Analysis

¶ 8    Linton contends that the postconviction court erred by denying the following claims without holding a hearing: (1) violation of his right to effective assistance of counsel; (2) violation of his constitutional rights by failing to adequately accommodate his hearing loss; and (3) violation of his Eighth Amendment rights by imposing a sentence disproportionate to his crime.  We address each contention in turn.

### A.    Linton's Ineffective Assistance of Counsel Claims Do Not Warrant a Hearing

¶ 9    Linton contends that he was denied effective assistance of counsel in violation of the Sixth Amendment.  He claims that his lawyers were ineffective by failing to (1) hire an expert to enhance the surveillance video footage of the incident; (2) present evidence from a kinesiology expert; and (3) secure the presence of an exculpatory witness.  Lastly, he asserts that (4) the combined prejudice from these failures amounts to cumulative error.  We disagree.

### 1. Standard of Review and Applicable Law

¶ 10     We review de novo a district court's denial of a Rule 35(c) motion without a hearing. *See People v. Phipps*, 2016 COA 190M, ¶ 20.

¶ 11     When the motion, the files, and the record clearly establish that the defendant is not entitled to relief, a court may deny a Rule 35(c) motion without a hearing. *Ardolino v. People*, 69 P.3d 73, 77 (Colo. 2003). Summary denial of a motion for postconviction relief without a hearing is also appropriate if the claims raise only an issue of law, or if the allegations, even if true, do not provide a basis for relief. *People v. Venzor*, 121 P.3d 260, 262 (Colo. App. 2005). Likewise, if the claims are bare and conclusory in nature and lack supporting factual allegations, the court may deny the motion without a hearing. *Id.*

¶ 12     Review under Rule 35(c) is limited. The proceedings "are intended to prevent injustices after conviction and sentencing, not to provide perpetual review." *People v. McDowell*, 219 P.3d 332, 335 (Colo. App. 2009). One ground for review is "[t]hat the conviction was obtained or sentence imposed in violation of the Constitution or laws of the United States or the constitution or laws of this state."

Crim. P. 35(c)(2)(I). In a Rule 35 proceeding, "the legality of the judgment and the regularity of the proceedings leading up to the judgment are presumed, and the burden is upon the applicant to establish by a preponderance of the evidence the allegations of his motion." *Kailey v. Colo. State Dep't of Corr.*, 807 P.2d 563, 567 (Colo. 1991).

¶ 13     In all criminal prosecutions, a defendant is entitled to the assistance of counsel for his defense. U.S. Const. amend. VI. As the United States Supreme Court has long recognized, "the right to counsel is the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (citation omitted).

¶ 14     "In order to prevail on an ineffective assistance of counsel claim, a defendant must prove that 1) counsel's performance was deficient and 2) the deficient performance prejudiced the defense." *Dunlap v. People*, 173 P.3d 1054, 1062 (Colo. 2007) (citing *Strickland*, 466 U.S. at 687). A court may resolve an ineffective assistance of counsel claim "solely on the basis that the defendant has failed in either regard." *People v. Romero*, 2015 COA 7, ¶ 25 (citing *People v. Garcia*, 815 P.2d 937, 941 (Colo. 1991)).

6

## 2. The Enhanced Video Footage

¶ 15    Linton argues that his counsel was ineffective and prejudiced him by failing to retain an expert to enhance the surveillance footage of the shooting to corroborate his assertion that the shooting was accidental.

¶ 16    To support this postconviction argument, Linton retained an expert who enhanced the surveillance video and provided that enhanced video to the postconviction court. Linton asserts that the enhanced video shows that his index finger was on the barrel of his gun and that his middle finger was in the trigger guard, consistent with someone who did not intend to pull the trigger. Further, he argues that such facts — combined with the shape of the gun, his hand positioning on the weapon, and the holster that he used — led him to accidentally discharge the firearm with his middle finger. He contends that by failing to properly investigate and present this aspect of his defense, his trial attorney was ineffective. And he argues that such ineffectiveness, coupled with the resulting prejudice, violated his Sixth Amendment rights. Additionally, Linton argues that the enhanced video, unlike the unenhanced version admitted at trial, shows that he fired before activating the

7

targeting laser — contrary to the prosecution's argument that he laser-sighted the gun before he fired.

¶ 17      In ruling on Linton's Rule 35(c) petition, the postconviction court analyzed the enhanced video footage and concluded that it added nothing new.  We agree with Linton that, as far as his asserted finger placement was concerned, the court was incorrect in making this determination without holding a hearing.  At the prehearing stage of a Rule 35(c) petition, all asserted facts must be taken as true.  *See People v. Chavez-Torres*, 2016 COA 169M, ¶ 31 ("The denial of a claim of ineffective assistance of counsel without a hearing is justified if, but only if, the existing record establishes that the defendant's allegations, even if proven true, would fail to establish either constitutionally deficient performance or prejudice."), *aff'd*, 2019 CO 59.  Linton asserted that his finger was misplaced on the barrel of the gun and claimed that the enhanced video supported that factual assertion.  Based on our review of the enhanced video, and the stills taken from it, the video (though blurry) could suggest to a jury that Linton's index finger was along the barrel of the gun, which — according to the assertions in the motion — left his middle finger in the trigger guard.  Thus, the video

potentially added something new in support of Linton's theory that he accidentally fired the gun, believing that his middle, ring, and pinky fingers were on the gun grip.

¶ 18    However, we agree with the postconviction court that, as far as the sequence of the shooting and triggering the laser sight was concerned, there is no meaningful difference between the unenhanced and enhanced videos.  In our review of the two videos, it was difficult to see the exact sequence of events and whether the plume of smoke from the gun appeared before the laser activated. The enhanced video did not add anything new on this point.

¶ 19    Regardless of these two points, we also agree with the postconviction court that Linton's assertions regarding his finger placement and the enhanced video fail to demonstrate prejudice. Under the prejudice prong, Linton must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.  Even if counsel erred by failing to engage an expert to enhance the video, that omission does not establish prejudice.

¶ 20    First, the enhanced video is extremely blurry, and, as the postconviction court noted, "even zoomed in and slowed down, it is very difficult to make out [Linton's] fingers."  We agree that, despite arguably providing some evidence for Linton's position, the enhanced video is of limited evidentiary value because it is so blurry.  This limited value does not undermine the evidence presented at trial.  *See People v. Dillard*, 680 P.2d 243, 245 (Colo. App. 1984) (determining that evidence of questionable benefit does not demonstrate prejudice from counsel's failure to call an expert).

¶ 21    Second, at trial, Linton testified, "I didn't fire it intentionally.  It was totally an accident.  My finger slipped inside the trigger guard as I was pulling the gun up, and set the gun off."  But the jury was not merely weighing Linton's finger placement.  Both versions of the surveillance video showed Linton exiting his truck and within approximately twenty seconds — and without provocation or in response to any aggressive action — pointing his gun directly at the victim.  Linton then shot the victim without hesitation or visible surprise, reholstered the gun, and watched the victim crawl on the ground.  According to witness testimony, he leaned over the victim

10

and said, "You see what you made me do. You see what you made me do."

¶ 22 Even accepting as true that the enhanced video provides corroborating evidence about which finger pulled the trigger, that evidence doesn't constitute a reasonable probability sufficient to undermine confidence in the outcome. The jury had ample evidence from which it could evaluate Linton's mental state. The unenhanced video evidence showed the sequence of events and Linton's reaction to those events. And the jury was able to evaluate Linton's version of events. Linton does not explain, and we don't see, how corroboration of his finger placement would have resulted in a different outcome in the face of other evidence adduced about his mental state at trial.

¶ 23 Thus, Linton's enhanced video claim fails to allege prejudice because he cannot demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ardolino*, 69 P.3d at 76. And because a court may resolve an ineffective assistance of counsel claim solely on the basis that the defendant has failed to establish either

11

deficient performance or prejudice, *see Romero*, ¶ 25, we discern no error in the postconviction court's ruling.

### 3. The Kinesiology Expert

¶ 24 Linton contends that his counsel was ineffective and prejudiced him by failing to retain an expert in kinesiology to testify in support of his argument that his grip on the gun resulted in an unintentional shooting.

¶ 25 In support of this argument, Linton's postconviction counsel consulted with a kinesiologist, Dr. Roger Enoka. In his Rule 35(c) petition, Linton claimed that Dr. Enoka would have testified at trial that Linton's fingers were misaligned on the gun and that his middle, ring, and pinky fingers are all controlled by the same muscle. Linton argues that Dr. Enoka's testimony would have demonstrated that Linton involuntarily discharged the weapon when he squeezed the handle of the gun. Linton argues that his trial counsel was ineffective because Dr. Enoka would have been a better expert witness for his accidental discharge defense than Chief Dan Montgomery, the former law enforcement officer whom his trial counsel called as an expert at trial. Alternatively, Linton

argues that Dr. Enoka's potential testimony was a necessary but omitted addition to Chief Montgomery's testimony.

¶ 26    When addressing trial counsel's performance, we evaluate that performance from counsel's perspective at the time the representation occurred while "ignoring 'the distorting effects of hindsight.'" *People v. Lopez*, 2015 COA 45, ¶ 59 (quoting *Davis v. People*, 871 P.2d 769, 772 (Colo. 1994)).  Additionally, we must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Strickland*, 466 U.S. at 689.

¶ 27    Viewed in this light, Linton's argument that another expert would have been better than — or needed in addition to — the expert his counsel called at trial relies on the distortion of hindsight.  *See Lopez*, ¶ 59.  At trial, Linton's counsel called Chief Montgomery to testify as an expert "in the area of accidental discharge concerning a citizen use of the gun."  Chief Montgomery testified about how negligent or accidental discharges can occur, the four fundamental rules of firearms control, and examples of negligent discharges.

¶ 28    Linton contends that Dr. Enoka's testimony would have provided a biomechanical explanation for part of Linton's account of the shooting.  But given that trial counsel called another well-qualified witness to testify regarding the same accidental discharge theory, this allegation does not overcome the strong presumption of reasonableness that we afford to trial counsel's decision-making.  *See id.*  Based on his argument, Linton only reached the conclusion that he needed additional or different expert testimony to support this defense after he was dissatisfied with the result of Chief Montgomery's testimony.

¶ 29    Contrary to Linton's argument, the motion and the record demonstrate that his trial counsel investigated his case and retained an expert specifically qualified on the defense he argued at trial.  Therefore, the record directly refutes Linton's claim that his trial counsel failed to properly investigate.  *See Phipps*, ¶ 19.  While it may be true that Dr. Enoka could have provided some support for Linton's case at trial, we cannot say on this record that counsel's performance in obtaining a law enforcement expert, but not a kinesiology expert, constituted deficient performance.

¶ 30    Thus, we conclude that the postconviction court did not err by denying this claim without a hearing.  *See Romero*, ¶ 25.

### 4.    The Missing Witness

¶ 31    Linton contends that his counsel was constitutionally ineffective by failing to secure a witness, Joseph Deede, to testify at trial.  Linton asserts that Deede would have testified that Linton told him the gun accidentally went off and that Linton appeared quiet and remorseful.

¶ 32    The postconviction court found that Linton's trial counsel failed to secure Deede's presence at trial because counsel had failed to show due diligence.  The court refused to allow Deede to testify telephonically for the same reason.  But the postconviction court ultimately determined that Linton failed to allege prejudice stemming from that defective performance.  We agree with the postconviction court that Linton failed to allege that he was prejudiced by trial counsel's failure to secure Deede's presence at trial.

¶ 33    At trial, Linton's attorney elicited the following testimony regarding Linton's accidental discharge defense:

- On the first day of trial, the victim testified that Linton, after shooting him, said, "You see what you made me do. You see what you made me do." The victim testified that Linton then said, "I didn't mean to do it. I didn't mean to do it."

- The victim repeated those statements on the second day of trial and affirmed that Linton seemed shocked that he had shot him.

- Linton's trial counsel also pointed out that a witness told a responding police officer that Linton seemed dazed after the shooting.

- Another witness said that, following the shooting, Linton might have been in a state of shock and that he heard other people saying that Linton had called it an accident.

- One of the responding paramedics testified that the victim told him that Linton said "I'm sorry" after the shooting.

- Detective James Zamora testified that Linton told him he was shocked by the incident.

- Linton's trial counsel also pointed out that Linton told Detective Zamora that he "didn't know the [gun's] handle was not in [his] palm."

- Detective Zamora affirmed that Linton said he was "shook up" after the incident and "[he] just couldn't believe it happened and [he] was just stunned."

- Linton's trial counsel also emphasized testimony and evidence supporting the accidental discharge defense during opening statements and closing arguments.

¶ 34    Linton argues that Deede's testimony was critical for the defense because it "would have supported and corroborated . . . Linton's claim that the discharge of the gun was accidental" and "rebutted the prosecution argument that [Linton] was callous and indifferent after the incident." We are not persuaded.

¶ 35    Given the extensive testimony from multiple witnesses summarized above, Deede's proposed testimony would have been cumulative of other evidence the jury had already heard.[1] Though Deede's testimony may have been admissible, *see People v. Melendez*, 102 P.3d 315, 320 (Colo. 2004) ("[C]umulative evidence

---

[1] During the colloquy in which Linton requested a continuance in lieu of Deede's written testimony or telephonic testimony, the trial court found that Deede's proffered testimony would be cumulative of that of other witnesses or improper speculation on Linton's thought process.

that may corroborate the defendant's own statement should ordinarily be admitted."), that doesn't make it critical. To the contrary, the jury heard testimony that Linton said that the shooting was an accident and that his demeanor was "dazed," "in shock," shook up," and "stunned." As a result, we don't see how Deede's testimony would have changed the outcome of the trial. *See People v. Washington,* 2014 COA 41, ¶ 35 (concluding defense counsel wasn't constitutionally ineffective for failing to present evidence that would have been cumulative of other witness testimony on the same topic).

¶ 36     Thus, Linton's assertions, taken as true, don't "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. We discern no error in the postconviction court's denial of this claim without a hearing. *See Chavez-Torres,* ¶ 31.

5.     Cumulative Prejudice

¶ 37     Linton contends that trial counsel's errors and omissions constituted cumulative error, entitling him to relief.

18

¶ 38 The People assert that "the cumulative error doctrine has no applicability to ineffective assistance claims." But Colorado courts have recognized that an individual may bring a cumulative prejudice argument[2] regarding ineffective assistance of counsel. *See, e.g., People v. Gandiaga*, 70 P.3d 523, 529 (Colo. App. 2002) ("[P]rejudice may result from the cumulative impact of multiple attorney errors . . . ."); *see also Dunlap*, 173 P.3d at 1081 (declining to reach a cumulative prejudice argument because trial counsel's actions did not fall below an objective standard of reasonableness); *People v. Garner*, 2015 COA 174, ¶ 75 (denying ineffective assistance of counsel cumulative error claim in postconviction appeal).

¶ 39 Regardless, Linton's cumulative prejudice claim cannot prevail. Even if we assume error on the part of his attorneys, those errors were neither so numerous nor so prejudicial as to have deprived Linton of a fair trial. *See Gandiaga*, 70 P.3d at 529. We

---

[2] In the context of a Crim. P. 35(c) petition for ineffective assistance of counsel, a cumulative error argument is more properly characterized as "cumulative prejudice." *See Dunlap v. People*, 173 P.3d 1054, 1081 (Colo. 2007).

19

therefore conclude that the postconviction court did not err by denying this claim without a hearing.

## B. Failure to Provide Accommodations for Hearing Loss

¶ 40    Linton next contends that the postconviction court was required to grant a hearing on his assertion that the trial court violated his constitutional rights to due process, equal protection, confrontation, and to present a defense by failing to provide adequate accommodations for his hearing loss disability. *See* U.S. Const. amends. V, VI, XIV; Colo. Const. art. II, §§ 16, 18, 25. Reviewing his claim de novo, *see Phipps*, ¶ 20, we disagree that the postconviction court erred.

¶ 41    The postconviction court denied Linton's constitutional claim as successive because he could have raised it in his direct appeal. Linton argues that this ruling was improper because "there was no way to litigate this issue on direct appeal, as trial counsel had failed to make an adequate record on the issue."

¶ 42    This argument misunderstands the law. Plain error is designed to correct an "error that is so obvious that a trial court should be able to avoid it without benefit of objection." *People v.*

20

*Sparks*, 2018 COA 1, ¶ 36. Additionally, "the error must so undermine the trial's fundamental fairness as to cast serious doubt on the conviction's reliability." *Id.*

¶ 43    Rule 35(c)(3)(VII) "bars postconviction claims that 'could have been presented in an appeal previously brought or postconviction proceeding previously brought.'" *People v. Taylor*, 2018 COA 175, ¶ 17 (quoting Crim. P. 35(c)(3)(VII)). And its "language is mandatory rather than permissive." *Id.* Linton does not argue that his claim falls within any exceptions to this bar. Linton could have raised this claim on direct appeal, even if it was unpreserved and even if arguing the claim would have been hampered by a poorly developed record. *See Hagos v. People*, 2012 CO 63, ¶ 14 ("Finally, we review all other errors, constitutional and nonconstitutional, that were not preserved by objection for plain error."). Thus, the postconviction court did not err by denying as successive his claim that the trial court did not adequately protect his constitutional rights during the trial. *See* Crim. P. 35(c)(3)(VII); *Taylor*, ¶ 17.

¶ 44    Linton also argues that his counsel was ineffective by failing to ensure that his hearing disability was accommodated during the

trial.  But as the postconviction court noted, this claim is refuted by the record.

¶ 45     Linton's trial attorney alerted the court to Linton's hearing loss at a pretrial hearing and again raised the issue at the beginning of jury selection.  The trial court repeatedly recognized Linton's hearing loss and took steps to ensure that he could hear and that defense counsel felt comfortable raising the issue to the court.

> [Defense Counsel]: And, Your Honor, . . . I presume the [c]ourt did listen to the interview of Mr. Linton --
>
> THE COURT: I haven't.
>
> [Defense Counsel]: But I want to remind the [c]ourt he is hard of hearing.  And we've had through the course of proceedings we've just tried to remind people to speak into the microphone.
>
> THE COURT: Okay.
>
> [Defense Counsel]: He's told me when the [c]ourt's speaking, when the [c]ourt speaks into the microphone, he doesn't have any trouble hearing at all.  I tend to be loud.  He hasn't had any trouble hearing me.  The government, when they were standing at the table, he had some trouble hearing them.
>
> THE COURT: Okay.  What I'm going to suggest then to the [district] attorneys is you get that microphone in front of you . . . except for

22

objections. And just speak loud, we'll go from here.

[Prosecutor]: Yes, Your Honor.

THE COURT: And the other thing, I was going to say, Mr. Linton, it's really important that you hear everything. So if there is something you don't hear, will you nudge your attorney, and then we'll repeat it to make sure you do hear it?

[Prosecutor]: And, Your Honor, in regards to jury selection, then, would the Court want me to stay near the podium --

THE COURT: Yes.

[Prosecutor]: -- with the microphone?

THE COURT: Yes. And I think the court reporter probably would like that as well. So --

[Prosecutor]: Of course.

THE COURT: -- I'll caution everybody, I'm the biggest offender, please talk slowly, and don't talk over each other. That way we'll get a good record.

¶ 46    Additionally, when informed that Linton could not hear things, the trial court immediately took appropriate steps to accommodate his hearing loss. For example, Linton's trial counsel took the following steps during trial:

23

- Counsel informed the court that Linton could not hear the prosecution's opening statement, in response to which the prosecutor said he would speak louder.

- Counsel interrupted the trial court at least twice to ask the court to speak into the microphone.

- Counsel ensured that the defense table had access to real time stenographic transcription of the trial that allowed Linton to read a real time transcript of the proceedings.

- When the defense table lost access to the real-time transcription, counsel promptly informed the court of the problem. The court immediately supplied Linton with headphones, which Linton confirmed helped.

- Counsel emphasized Linton's hearing challenges during sentencing.

¶ 47   Therefore, the record refutes Linton's argument that his counsel was ineffective for failing to ensure that the court knew of and accommodated his hearing disability so that he was able to

hear and participate in the proceedings.[3]  And a Rule 35(c) motion may be denied without a hearing "if the record directly refutes the defendant's claims." *Phipps*, ¶ 19.  Thus, we discern no error in the postconviction court's denial of Linton's disability accommodation claims without a hearing.

### C.    Linton's Proportionality Claim

¶ 48    Lastly, Linton contends that his sentence is grossly disproportionate to his crime.  *See* U.S. Const. amend. VII; Colo. Const. art. II, § 20.  The postconviction court determined that Linton's proportionality argument was barred as successive. Reviewing the court's ruling de novo, *see Phipps*, ¶ 20, we agree with the court's determination.

¶ 49    Linton argues that "established Colorado law . . . holds [that] because proportionality is a function of the Eighth Amendment . . . [,] it is properly cognizable under [Rule] 35(c)." While it's true that a proportionality challenge is cognizable under

---

[3] Linton also argues, without citation to the record, that the court provided him with a hearing device that did not work.  But the record refutes this claim and indicates that Linton confirmed that he could hear the witnesses when they were speaking into the microphone.

Rule 35(c), *People v. Crawley*, 2024 COA 49, ¶¶ 7-9, that doesn't resolve the successiveness problem in this case. The procedural bars, including successiveness, apply to constitutional claims raised under the rule. *See People v. Isom*, 2015 COA 89, ¶ 32 (holding that a postconviction indeterminate sentence challenge was time barred and successive), *aff'd*, 2017 CO 110. And Rule 35(c)'s language is mandatory. It requires a postconviction court to deny a claim that *could have* been brought in a previous appeal or postconviction proceeding. *Taylor*, ¶ 17.

¶ 50 So the appropriate question in this case is not whether a proportionality challenge can ever be brought in a postconviction proceeding, but rather, whether Linton could have brought his proportionality challenge in his direct appeal. A defendant is permitted to bring a proportionality claim on direct appeal. *See, e.g., People v. Loris*, 2018 COA 101, ¶ 9. Linton doesn't explain why that general rule doesn't apply to him, and he doesn't claim that any of the exceptions to the successiveness bar apply to his case.

¶ 51 Instead, Linton relies on *Crawley*, ¶¶ 7-9, *People v. Moore-El*, 160 P.3d 393, 395-96 (Colo. App. 2007), and *People v. Castillo*, 2022 COA 20, ¶ 38, in support of his argument that he can bring

his proportionality claim for the first time in his postconviction challenge. But those cases don't help him. In *Crawley*, the defendant pleaded guilty and his proportionality challenge under Rule 35(c) was his first challenge to his sentence. *Crawley*, ¶¶ 3-4. So the successiveness bar did not apply in that case. In *Castillo*, the division did conduct a proportionality review for the first time during a postconviction appeal. *Castillo*, ¶¶ 36-44. But the defendant's claim failed on other grounds, *id.* at ¶ 44, and there's no indication that the People challenged his claim as successive in that case. Finally, in *Moore-El*, the division concluded that the proportionality review was time barred and could not be considered under the rule. 160 P.3d at 395-96. If anything, this conclusion lends support to the People's position that the procedural bars apply to postconviction proportionality review claims.

¶ 52 Given all of this, we conclude that Linton could have raised his proportionality challenge in his direct appeal, and the postconviction court did not err by concluding that his challenge is barred as successive.

## III. Disposition

¶ 53 The postconviction court's order is affirmed.

27

JUDGE DUNN and JUDGE LIPINSKY concur.